FILED
*April 24, 2015*
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-14-00605-CR
5021070
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/24/2015 11:14:28 AM
JEFFREY D. KYLE
CLERK

CAUSE No. 03-14-00605-CR

IN THE COURT OF APPEALS
FOR THE THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

Dr. HOWARD THOMAS DOUGLAS
Appellant,

v

THE STATE OF TEXAS
Appellee.

On appeal from Cause No. D-1-DC-12-900059, in the 331st District Court,
Travis County, Texas

## APPELLANT'S BRIEF

HAMMERLE FINLEY LAW FIRM
Craig M. Price
State Bar No. 16284170
2871 Lake Vista Drive, Suite150
Lewisville, Texas  75067
Telephone: 972-436-9300
Telecopier: 972-436-9000
cmp@hammerle.com

ATTORNEY FOR APPELLANT

I.

Identity of Parties and Counsel

Trial Judge: Honorable Robert A. Perkins
331st Judicial District Court
1104 Nueces, Suite 203
Austin, Texas 78701

Defendant: Dr. Howard Thomas Douglas
391 E. Las Colinas Blvd, Suite 130-614
Irving, Texas 75039

Counsel: Craig M. Price,
E-Mail: cmp@hammerle.com
**HAMMERLE & FINLEY**, **LLC**
2871 Lake Vista Drive, Suite 150
Lewisville, Texas 75067
SBN 16284170

State: Donna Crosby,
Travis County Criminal District Attorney
509 West 11th Street
Austin, Texas 78701
SBN 05118700

## II.

## Table of Contents

Identity of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Index of Statues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Appellant's Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Statement of facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Issue one. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Evidence was legally insufficient to support Jury's verdict. . . . . . . . . . . . 5

1.     No legally sufficient evidence supports a finding of intent to defraud or harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2.     No legally sufficient evidence supports a finding that Appellant engaged in deception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

3.     No legally sufficient evidence exists that Appellant caused to be submitted a form HCFA 1500 seeking payment for services rendered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4.     No legally sufficient evidence exists, other than uncorroborated testimony of accomplice witness, that Appellant caused TMIC to execute any document. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5.     No legally sufficient evidence supports the jurisdictional amount for a third degree felony because the State did not segregate the proper amount billed from allegedly fraudulent amounts billed. . . 12

6.     No legally sufficient evidence supports the amount of restitution. . 16

Issue Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


Appellant was denied a fair trial because of ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 17

B.     Appellant's trial counsel was ineffective throughout . . . . . . . . . . . 18

III.

Table of Authorities

*Jackson v. Virginia*, 443 U.S. 307, 313 (1979) . . . . . . . . . . . . . . . . . . .     5

*Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) . . . . . . . .     5

*Jackson*, 443 U.S. at 319. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5

*Brooks v. State*, 323 S.W.3d 893, 903, 912 (Tex. Crim. App. 2010) . . .     5

*Wise v. State*, 364 S.W.3d 900, 903 (Tex.Crim.App. 2012) . . . . . . . . . .     5

*Winfrey v. State*, 323 S.W.3d 875, 882 . . . . . . . . . . . . . . . . . . . . . . . .     5, 20

*Williams v. State*, 235 S.W.2d 742, 750 (Tex. Crim. App. 2007) . . . . . .     5

*Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011) . . . . . . . . .     6

*Goldstein v. State*, 803 S.W.2d 777, 791 (Tex. App.—Dallas 1991, pet
    ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

*Goldstein*, 803 S.W.2d at 701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

*Lamar v. State*, Cause No. 05-09001315- CR No.; -01316; 01317, (Tex.
    App.—Dallas 2010,_____) (not published) . . . . . . . . . . . . . . . .     9, 10

*Mosley v. State*, Cause No. 05-09-001315- CR No. 01316-CR No.;
    01317-CR No. . . . . . . . . . . . .. . . . . . . . . .. . . . . . . . . . . . . . . .     11, 12

*Cathey v. State*, 992 S.W.2d 460, 463, n.2 (Tex. Crim. App. 1999), *cert.
    denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000). . .     11

*Blake v. State*, 971 S.W.2d 451, 455 (Tex.Crim.App. 1998) . . . . . . . . . .     11

*Moore v. State*, 984 S.W.2d 783, 787 (Tex.App.—Waco 1999, no pet.) .     11

*Beathard v. State*, 767 S.W.2d 423, 430 (Tex. Crim. App. 1989), *cert.
    denied*, 528 U.S. 954, 120 S.Ct. 380, 145 L.Ed.2d 296 (1999) . . .     12

*Smith v. State*, 681 71, 75-76 (Tex. App.—Houston [14th Dist.] 1983),
   *aff'd*, 722 S.W.2d 408 (Tex. Crim. App. 1986) . . . . . . . . . . . . . .   11, 14

*Lehman v. State*, 792 S.W.2d 82, 84 (Tex. Crim. App. 1990) . . . . . . . .   13, 15

*Simmons v. State*, 109 S.W.3d 469, 472 (Tex. Crim. App. 2003) . . . . .   13,15

*Lee v. State*, 29 S.W.3d 70, 575 (Tex. App.—Dallas 2000) . . . . . . . . .   14, 22

*Fisher v. State*, 803 S.W.2d 828, 830 (Tex. App.—Dallas 1991, pet. ref'd)   21

*Cartwright v. State*, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980) . . . .   16

*Thompson v. State*, 9 S.W.3d  (Tex.Crim.App. 1999) . . . . . . . . . . . . . .   17,18

*Aldrich v. State*, 296 S.W.3d 225 (Tex.App.—Fort Worth 2009, pet. ref'd)
   (op. on reh'g *en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Bone v. State*, 77 S.W.3d 828, 833 (Tex.Crim.App. 2002) . . . . . . . . . . . .   18

*Andrews v. State*, 159 S.W.3d 98, 101-02 (Tex.Crim.App. 2005) . . . . . . .   18, 19

*Cannon v. State*, 252 S.W.3d 342, 349-50 (Tex.Crim.App. 2008) . . . . . . .   18, 21

*United States v. Cronic*, 466 U.S. 648, 658-59 (1984) . . . . . . . . . . . . . . .   18, 21

*Strickland v. Washington*, 466 U.S. 668, 692 (1984) . . . . . . . . . . . . . . .   18

*Vaughn & Sons, Inc. v. State*, 750 S.W.2d 17, 18 (Tex. App.—Texarkana
   1988,____). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Young v. State*, 957 S.W.2d 923 (Tex.App.—Texarkana 1997) . . . . . . . .   21

*Fuller v. State*, 73 S.W.3d 250, 257 (Tex. 2002) . . . . . . . . . . . . . . . . . .   22

*Montgomery v. State*, 810 S.W.2d 272, 291 (Tex.Crim.App. 1990)
   (op'n on  rehearing). . . . . . . . . . . . . . . .. . . . . . . . . . . . . .. . . . . . . . .   35

Statutes:

Tex. R. App. P. 38.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

Texas Penal Code Ann. §32.46(a)(1) (Vernon Supp. 2002) . . . . . . . . .    7, 15

Tex. Penal Code Ann., §32.46(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . .     8

Tex. Penal Code Ann., §6.03(a) (Vernon 2012). . . . . . . . . . . . . . . . . .     8

Tex. Penal Code Ann., §31.01(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . .     9

Tex. Code of Crim. Proc. Ann., Sec. 38.14. . . . . . . . . . . . . . . . . . . . .    11

Tex. Penal Code Ann., Sec. 8.02[a] . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Tex. Penal Code Ann., Sec. 803[b][1] . . . . . . . . . . . . . . . . . . . . . . . .    20

Texas Penal Code Sec. 7.24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

## STATEMENT OF THE CASE

Appellant appeals his conviction by a jury in Travis County, Texas, for the third degree felony offense of securing execution of a document by deception. Appellant was sentenced by the judge to 5 years in prison. [CR 190]

IN THE COURT OF APPEALS
FOR THE THIRD COURT OF APPEALS
DISTRICT AUSTIN, TEXAS

Dr. HOWARD THOMAS DOUGLAS,
Appellant,

VS.

THE STATE OF TEXAS,
Appellee.

On appeal from Cause No. D-1-DC-12-900059, in the 331st District Court, Travis County, Texas

## APPELLANT'S BRIEF

**TO THE HONORABLE THIRD COURT OF APPEALS:**

COMES NOW, Appellant, Dr. Howard Thomas Douglas (hereafter "Appellant"), and files his Appellant's Brief, and in support thereof respectfully shows the following:

### I.

### STATEMENT OF FACTS

Appellant is a medical doctor. He had incorporated a company known as North Texas Medical Evaluators (hereafter "NTME"), which provided medical

services in the worker's compensation sector to various entities that were insured by Texas Mutual Insurance Company (hereafter "TMIC"). [5 RR 128-129, 132-43] Among the services it provided, NTME would perform Functional Capacity Evaluations (hereafter "FCEs") for individuals to determine their ability to return to work or to perform certain jobs. [4 RR 120-42; 5 RR 89-103] Employees of NTME would perform these FCEs, then prepare their reports, which were reviewed by physicians employed by NTME, and then the reports would be submitted *by NTME* to TMIC. [4 RR 156-76]   NTME would bill TMIC for these services according to certain authorized billing codes, and TMIC would then issue a check to NTME based on their audit of NTME's bills.

NTME's invoices were divided into increments, as permitted by the industry, so that they would bill for "units" of time based on the actual amount of time spent on the patient's FCE, including time spent preparing and reviewing a report. [5 RR 20-46; 6 RR 166]   NTME took the position that it was permitted by industry standards to bill for a maximum of 16 units – with each unit representing a quarter hour (15 minutes) -- if the NTME agents spent that amount of time working on the FCE file, regardless of whether the agent was meeting face-to-face with the patient. [6 RR 166] However, TMIC took the position that NTME could bill *only* for the amount of time that NTME's representative, whether it was a physician, a technician or some other employee, spent in a face-to-face consultation

or meeting with the person for whom the FCE was being conducted (*i.e.*, the patient).  [3 RR 42, 47-49]

During the course of an audit of NTME's billings, TMIC determined that NTME was improperly billing it for time that was not compensable; *i.e.*, any portion of the FCE that was not spent face-to-face with the patient. [ 3 RR 57-59] TMIC's in-house investigators spoke with several people who had received FCEs from NTME-affiliated doctors, and TMIC believed that NTME was billing it for time that was not compensable.  TMIC then conducted a "sting" operation in which they sent one of its investigators, Bonita Reid, posing as a patient, to an NTME-affiliated doctor, who ordered that Ms. Reid have an FCE.  Ms. Reid then went to an NTME technician for the FCE.  According to its investigation, TMIC determined that the face-to-face portion of Ms. Reid's FCE did not last the amount of time for which NTME billed TMIC – 16 units (four hours).  Based on its investigation, TMIC apparently filed a complaint with the Travis County Criminal District Attorney's Office, and this prosecution resulted. [5 RR 60-83]

Appellant was charged in his individual capacity in Cause No. D1-DC-12-900059, while NTME was charged in its corporate capacity in a different matter. [CR 5] NTME was not indicted in the same cause number as Appellant, but was indicted in Cause No. D-1-DC-10900206.

During trial, Appellant's attorney discovered for the first time, and not from

any disclosure initiated by the State, that TMIC provides the financial funding for the two prosecutors with the Workers' Compensation Fraud Unit of the Travis County Criminal District Attorney's Office who prosecuted this case, Ms. Donna Crosby and Ms. Meg Brooks, as well as for one paralegal and one part-time staff person in that unit. [5 RR 60-83] Appellant attempted to introduce into evidence the existence of this financial relationship between TMIC and the State, but the trial court denied Appellant's request. [5 RR 82-83] Therefore, the jury never heard of this relationship.

## II.

## SUMMARY OF THE ARGUMENT

Appellant moves this Court to reverse the judgment against him because there is no legally sufficient evidence to support the jury's verdict against Appellant with respect to the finding that Appellant acted with the intent to defraud or harm; that he engaged in deception that caused Texas Mutual Insurance Company to execute any document. There also is no legally sufficient evidence that the pecuniary value of the amount of such document(s) satisfied the jurisdictional amount for a third degree felony, and a fatal , material variance existed in the pleading and the proof. Appellant also seeks a new trial on the grounds that the trial court erred in excluding information about a financial relationship between the State and Texas Mutual Insurance Company, the alleged "victim."

# III.

## ARGUMENT AND AUTHORITIES
### Issue One

**The evidence was not legally sufficient to support the jury's verdict on securing execution of a document by deception.**

**A.    *Standard of Review*.**

Due process requires that the State prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). When reviewing the sufficiency of the evidence to support a conviction, the reviewing court examines the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 903, 912 (Tex. Crim. App. 2010); *Wise v. State*, 364 S.W.3d 900, 903 (Tex.Crim.App. 2012). The sufficiency standard is the same for both direct and circumstantial evidence. *Wise*, 364 S.W.3d at 903.

It is the obligation and responsibility of appellate courts to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged. *Winfrey v. State*, 323 S.W.3d 875, 882; *Williams v. State*, 235 S.W.2d 742, 750 (Tex. Crim. App. 2007). The appellate court should measure the sufficiency of the evidence by the elements of the offense as defined by a

hypothetically correct jury charge. *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011).

**B.** *Evidence was not legally sufficient to support the verdict.*

The evidence was n o t legally sufficient to support the jury's guilty verdict against Appellant for securing the execution of a document by deception, and this Court should reverse the judgment against Appellant and render a judgment of not guilty in Appellant's favor.

Securing execution of a document by deception is proscribed by section 32.46 of the Texas Penal Code:

> A person commits an offense if, with intent to defraud or harm any person, he, *by deception causes another to sign or execute* any document affecting the pecuniary interest of any person.

Texas Penal Code Ann. §32.46(a) (1) (Vernon Supp. 2002) (emphasis added). The value alleged in the indictment and c o u r t' s charge made the offense a third degree felony. *See* Tex. Penal Code Ann., Sec. 32.46 (b) (5). [CR 5]

The application paragraph of the trial court's charge tracked the indictment, and permitted the jury to convict if it found beyond a reasonable doubt that Appellant, "did then and there *with intent to defraud and harm* the TEXAS MUTUAL INSURANCE COMPANY, *by deception* create and confirm by words or conduct a false impression of fact, to wit: the said Howard Thomas Douglas

caused to be submitted to the TEXAS MUTUAL INSURANCE COMPANY a form HCFA (Health Care Financing Administration) 1500 seeking payment for services rendered, said services were as follows: 16 units billed under CPT (current procedural terminology) code 97750, when in fact, 16 units of service were not rendered in accordance with the Texas Workers Compensation Medical Fee Guidelines not believing it to be true, that was likely to affect the judgment of the said Texas Mutual Insurance Company in the transaction which deception caused the Texas Mutual Insurance Company to sign or execute documents affecting its property, service or pecuniary interest, where the value of the property, service or pecuniary interest was more than $20,000 but less than $100,000 . . . ." [CR 172 (emphasis added)]  The State did not allege that Appellant acted negligently or recklessly; only that he acted with intent to defraud and harm. [CR 5]

As stated by Martha Luevano, the State's first witness, the FCE billing practice that the State considered to be fraudulent was the billing for time during which there was no face-to-face contact with the patient. [3 RR 47-49]  In other words, the State alleged that the fraud occurred because NTME billed for the time spent for work related to an FCE if that work was not spent in face-to-face interaction with the patient.  [3 RR 47-49; CR 5]

1. **No legally sufficient evidence supports a finding of intent by Appellant to defraud or harm.**

According to the State's allegation in its indictment, the question is whether the cumulative force of the facts in the record supports a deduction by any rational finder of fact of the logical consequence or conclusion that:

- *Appellant* did,

- *with intent to defraud and harm*

- the *TEXAS MUTUAL INSURANCE COMPANY*,

- *by deception* create and confirm by words or conduct a false impression of fact, to wit: the said Howard Thomas Douglas *caused to be submitted* to the TEXAS MUTUAL INSURANCE COMPANY *a form HCFA (Health Care Financing Administration) 1500 seeking payment for services rendered*, said services were as follows: 16 units billed under CPT (current procedural terminology) code 97750, *when in fact, 16 units of service were not rendered* in accordance with the Texas Workers Compensation Medical Fee Guidelines,

- *not believing it to be true*,

- that was *likely to affect the judgment of the said Texas Mutual Insurance Company* in the transaction, *[and]*

- *which deception caused the Texas Mutual Insurance Company to sign or execute documents affecting its property, service or pecuniary interest*, where the value of the property, service or pecuniary interest was *more than $20,000 but less than $100,000 . . . .*

[CR 5; 172 (emphasis added)]. In other words, the State alleged – and had to prove – that Appellant caused HCFA 1500 forms to be submitted by NTME seeking payment for 16 units of service by NTME when 16 units of service were not rendered in accordance with the Texas Workers Compensation Medical Fee Guidelines, and that Appellant did not believe that 16 units of service had been properly rendered when

the forms were submitted to TMIC.  [CR 5]

However, the evidence showed that Appellant *did believe* that NTME had actually rendered 16 units of compensable service, and Appellant *did believe* that NTME could properly bill TMIC for the time related to preparing a written FCE report, as well as for other time related to the FCE, even if such time was not spent face-to-face with the patient.  [4 RR 156-73; 4 RR 204-12; 5 RR 20-46; 6 RR 166]

There was no legally sufficient evidence adduced at trial that Appellant *knew* that billing for time spent writing an FCE report, even if conducted outside the presence of the patient, was *not* permitted by the Texas Workers Compensation Medical Fee Guidelines.  A person acts intentionally, or with intent, with respect to the nature of his conduct or with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann., Sec. 6.03(a) (Vernon 2012). Intent to deceive can be inferred from acts, words and conduct of the accused. *Goldstein v. State*, 803 S.W.2d 777, 791 (Tex. App.—Dallas 1991, pet ref'd).

The conclusion that Appellant possessed the *mens rea* for the offense of securing execution of a document by deception was simply theorizing or guessing by the jury as to the meaning of Appellant's alleged "directive" for NTME employees to bill for 16 units of an FCE, even though portions of the services billed were not conducted face-to-face with the patient.  Such a conclusion is not a logical deduction

from that conduct. *See Megan Winfrey*, 393 S.W.3d at 771. *See also Hacker*, 389 S.W.3d at 874 (recognizing that without proof of wrongful conduct "all of this evidence was mere 'suspicion linked to other suspicion'"); *Richard Winfrey*, 323 S.W.3d at 882 (holding that evidence giving rise to only a suspicion of guilt, even a strong one, is insufficient to support a conviction); *cf. Patrick*, 906 S.W.2d at 487 (holding evidence sufficient to support *mens rea* for murder).

Viewing all of the circumstantial evidence and any reasonable inferences from that evidence in the light most favorable to the State, the cumulative force of that evidence is insufficient to convince any rational factfinder beyond a reasonable doubt that Appellant acted with the requisite *mens rea* necessary to support his conviction for securing execution of a document by deception. *See, e.g., DeLay v. State*, Cause No. 03-11-00087-CR, at p. 21 (Tex. App.—Austin, Sept. 19, 2013, pet. granted) (lack of legally sufficient evidence that funds were "proceeds of criminal activity" requires an acquittal). *See also Stobaugh v. State*, Cause No. 02-11-00157-CR, at * p. 172 (Tex. App.—Denton, Jan. 23, 2014, pet. denied) (reversing conviction for murder because there was no legally sufficient evidence of intent to cause serious bodily injury to victim by committing an act clearly dangerous to human life that resulted in her death or that he intentionally or knowingly killed the victim).

Likewise, there was no testimony that TMIC would not have executed any checks payable to NTME *but for* Appellant's conduct. *See Goldstein*, 803 S.W.2d at

701; *Mosley v. State*, Cause No. 05-09-001315- CR No. 01316-CR No.; 01317-CR No., (Tex. App.—Dallas 2010, no pet.) (not published) ("Based on the record before us, we conclude a rational jury could find that but for appellant's actions, there would have been no lease."). *See also Smith v. State*, 681 S.W.2d 71, 75-76 (Tex. App.— Houston [14th Dist.] 1983), *aff'd,* 722 S.W.2d 408 (Tex. Crim. App. 1986) (misrepresentations cause victim to sign contract).

As a result, this Court should reverse the trial court's judgment and render a judgment of acquittal. *See* Tex. R. App. P. 43.2(c), 51.2(d); *Greene v. Massey*, 437 U.S. 19, 24–25, 98 S. Ct. 2151, 2154–55 (1978); *Burks v. United States*, 437 U.S. 1, 16–18, 98 S. Ct. 2141, 2150–51 (1978); *Megan Winfrey*, 393 S.W.3d at 774.

In this case, there exists no legally sufficient evidence – direct or circumstantial – that Appellant took any action with the required *mens rea*: with the intent to defraud and harm TMIC by deception. At best, the evidence showed that Appellant believed that NTME could legitimately bill TMIC for time related to an FCE even if such time was not spent face-to-face with the patient. [4 RR 156-73; 6 RR 166]

### 2. No legally sufficient evidence supports a finding that Appellant engaged in deception.

A person engages in deception by creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, *and that the actor does not believe to be true*. Tex. Penal

Code Ann., Sec. 31.01(1)(A) (emphasis added). The victim's testimony that he would not have executed the document *but for* the accused's conduct is sufficient to establish the element of deception. *See Goldstein*, 803 S.W.2d at 701. *See also Mosley v. State*, CR No. 01316-CR No.; 01317-CR No., (Tex. App.— Dallas 2010, no pet.) (*not published*) ("Based on the record before us, we conclude a rational jury could find that but for appellant's actions, there would have been no lease.").

Appellant's witnesses testified that industry standards allow companies like NTME to bill for a maximum of 16 units – with each unit representing a quarter hour -- if the NTME agents spent that amount of time working on the FCE file, regardless of whether the agent was meeting face-to-face with the patient. [4 RR 156-73; 5 RR 20-46; 6 RR 166] Additionally, Shelly Estrada, NTME's office manager, testified that NTME would not have billed for time spent preparing the report, which occurred beyond the face-to-face time spent with the patient unless such a practice was allowed [6 RR 166].

Additionally, in cases involving securing the execution of a document by deception, the State typically must prove that the victim would not have executed the document *but fo*r the accused's conduct in order to establish the element of deception. *See Goldstein*, 803 S.W.2d at 701. *See also* Cause No. 05-09-001315-CR No. 01316-CR No.; 01317-CR No., (Tex. App.—Dallas 2010, no pet.) (not

published) ("Based on the record before us, we conclude a rational jury could find that *but for* appellant's actions, there would have been no lease.")

Similarly, the State should have established that TMIC would not have executed the documents at issue *but for* the actions of Appellant. However, no evidence supports that conclusion, and no legally sufficient evidence exists to support the jury's verdict.

As a result, this Court should reverse the judgment against Appellant and render a not guilty verdict in his favor.

> **3. No legally sufficient evidence supports the jurisdictional amount because the State did not segregate the proper amount billed from allegedly fraudulent amounts billed.**

The State also failed to adduce any legally sufficient evidence of the difference between the value of allegedly fraudulent FCE services that were performed and billed by NTME and the value of the *properly billed* FCE testing services performed and billed by NTME. Therefore, the State failed to establish the *jurisdictional amount* of the offense by legally sufficient evidence.

In other words, the State had to prove that the pecuniary value of the portion of the documents that were signed as a result of fraud and deception had to have an aggregate value of $20,000 or more but less than $100,000. Otherwise, the State would not have established, by legally sufficient evidence,

that Appellant's alleged conduct rose to the level of a third degree felony.

The State relied on numerous checks to establish the jurisdictional value of this offense. In order for Appellant to be convicted of the offense of securing execution of a document by deception, the State had to establish by legally sufficient evidence the portion of the amount of each check relied upon in the indictment that was executed as a result of Appellant's *deception and fraud*. In other words, the State had to prove, beyond a reasonable doubt, the amount of each check that ***did not*** represent the value of services *actually rendered* by co-defendant NTME, and, therefore, was paid as a result of fraud.

Appellant does not argue that the statute requires the State to prove that actual harm resulted from the intent to defraud. *See Smith v. State*, 681 S.W.2d 71, 75-76 (Tex. App.—Houston [14th Dist.] 1983), *aff'd*, 722 S.W.2d 408 (Tex. Crim. App. 1986). However, because Appellant was charged with securing execution of a document by deception as a third degree felony -- $20,000 or more but less than $100,000 -- the State *was required* to prove a value that was sufficient to satisfy the jurisdictional requirement of its pleading. *See Lehman v. State*, 792 S.W.2d 82, 84 (Tex. Crim. App. 1990); *Simmons v. State*, 109 S.W.3d 469, 472 (Tex. Crim.App. 2003). *See also Lee v. State*, 29 S.W.3d 70, 575 (Tex. App.—Dallas 2000).

The State presented testimony that NTME could not properly bill for time in which the physician or other healthcare provider (*i.e.*, nurse, technician, etc.)

was not in the presence of the patient. Additionally, the State presented evidence that NTME had, in fact, billed TMIC for time that was not spent in a face-to-face meetings or consultations with each patient. However, there is no question that a portion of each check paid by TMIC to NTME, and each invoice from NTME on which those checks were based, included billing and payment for services that were actually and properly earned by NTME [5 RR 108-116; State's Ex. 5]. As a result, the State should have segregated the value of each document executed that was allegedly induced by Appellant's allegedly deceptive conduct.

The State essentially admitted at trial that it did not know the specific amount or portion of any document that allegedly was executed by deception. In fact, the State conceded that a portion of each check was induced by a legitimate amount of money owed to NTME, and not entirely by deception. [State's Ex.5] As a result, the State created an average amount of purported fraud on which to base its jurisdictional allegations. Kathleen Haden, TMIC's senior investigator, testified that she only spoke with a handful of the more than 135 patients named in the indictment:

> Q: Now, so of those, let's say, 138 people, you talked to six people that you can remember?
>
> A: Off the top of my head, yes. But I think, in total, I spoke with around 10 myself.

[3 RR 108]

Ms. Haden admitted that TMIC was just guessing about the amount of time

actually spent during the FCEs:

Q:  You don't know the exact amount of time that was spent in an FCE for somebody you didn't talk to you, do you?

A:  No, I do not.

[3 RR 112]

Q:  So is there a  -- there's three columns, one for you giving credit to the healthcare provider [NTME] for 2 units, correct?

A:  Yes.

Q:  And another column giving them 4 units of credit, correct?

A:  Yes.

Q:  And the third column is giving them no credits, correct?

A:  Well, the third column is the actual amount they charged and the actual amount we paid.

Q:  So it's based on 16 units?

A:  Correct.

Q:  So in the columns where you give the healthcare provider 2 units of credit and 4 units of credit – look for Mr. Ettinger.

A:  Okay.

Q:  Do you know how much time was actually spent on Mr. Ettinger's FCE?

A:  I would have to review my interview summary.

Q:  Okay.  But the number assigned to his FCE in those two columns may not be the actual amount of time he spent on his FCE, correct?

A:  It's possible, if we did the calculation for every single patient, giving credit

for 2 units or giving credit for an hour.

[3 RR 114-15]  Ms. Haden resisted stating the obvious about the State's calculations: that TMIC (in other words, the State) was just guessing:

> Q:  Right.  So the ones *where you give [NTME] credit for 2 units and 4 units, that's your hypothetical, correct*?
>
> A:  It's not a hypothetical.  It's based on the results of our investigation.
>
> Q:  Well, for Mr. Ettinger, it's hypothetical because it's not the actual time he told you, is it?
>
> Q:  On your chart, it does not reflect the actual amount of time that Mr. Ettinger spent in his FCE, does it?
>
> A:  No.  There is not a column with that information in it.
>
> Q:  You just decide a figure, based on your analysis, that it could have taken 2 units or it could have taken 4 units?
>
> A:  I didn't actually do the calculations, but that's what the spreadsheet reflects.  We did calculations for giving credit of 2 units and calculations for giving credit of 4 units.
>
> Q:  *So at least as far as you're concerned, of the 147 entries in the indictment, you don't know how much time was spent on each one of their FCE's do you*?
>
> A;  *On every single patient, no.*

[3 RR 115-16 (emphasis added)]  Rather, Ms. Haden admitted that she would only know the specific amount of time expended on the FCE's for those patients that she spoke with, personally, which was less than ten people.  [3 RR, 108- 116]

TMIC even paid a claim for Bonita Reid, which was set up as a false claim pursuant to TMIC's undercover investigation:

Q: And how much did you pay her for it?

A: We paid for 16 units.

Q: And why did you do that?

A: That's part of our undercover operation. It needs to appear as a normal claim.

[3 RR 129-30]

Even the State's bank records, which showed payments from TMIC to NTME, cannot identify the actual amounts paid to NTME for allegedly fraudulent invoices:

Q: So all you can tell from Exhibits 15A and 15B is these were checks from Texas Mutual Insurance Company that were deposited in a North Texas Medical Evaluators bank?

A: Yes, sir.

Q: Okay. Ms. [Wendy] Rasmussen, did you check to see what services relate to these deposits – what medical services relate to these deposits?

A: No, sir. I had the bank records. And I transferred the information on the bank records into a spreadsheet.

Q: Okay. So there is no way for you to tell, from Exhibits 15A and 15B, whether these payments are for FCEs or for some other service, correct?
A: No, sir.

Q: Okay. And you don't know if North Texas Medical Evaluators billed Texas Mutual Insurance Company for any other services, besides FCEs, do you?

A: No, sir.

[3 RR 174] No other witness testified that TMIC was billed by NTME only for FCEs, nor did any witness testify that TMIC only paid for allegedly fraudulent FCEs.

William Muhr, TMIC's senior fraud investigator, also participated in the investigation of NTME. Mr. Muhr stated that he spoke – either by telephone or in person -- with approximately nine of the workers who had FCEs performed. [3 RR 186] However, Mr. Muhr could only identify the names of two of those people during trial. [3 RR 186-87] Mr. Muhr also admitted that there was no rhyme nor reason behind which people he actually spoke with:

Q: Okay. You didn't try to talk to everybody, did you?

A: No, I did not.

Q: What determined who you tried to talk to?

A: There was no stipulation, just call people and find out how long the examination took.

[3 RR 188]

As a result, the State's investigator gave several different ***hypothetical amounts*** that could have constituted the amount of TMIC's property that was based on alleged fraud; the State certainly did not know. [3 RR108-16; State's Ex. 5] The State not only had to guess at the length of the actual FCEs, but it also had to admit that a portion of each test was legitimate and, therefore, not all of the payment was secured by alleged deception; rather, at least a portion of each document was based on legitimate entitlement to payment.

There is no question that a portion of each check paid by TMIC to NTME, and each invoice from NTME on which those checks were based, included billing

and payment for services that were actually and properly earned by NTME [    ]. The State simply never bothered to *accurately segregate* the amount of the checks that were procured lawfully, and without deception, from the amount of the checks that allegedly were induced by Appellant's purported deception. As a result, the testimony showed that the State's statistical underpinnings that allegedly made up its proposed amount of purported fraud were clearly based on convenient and rudimentary math and not on actual conduct. *In other words, the jury was simply guessing about the amounts of the documents that allegedly were secured by deception.*

Circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial, but juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *See, e.g.*, *Megan Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). "'[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them,' while '[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 16). A conclusion reached by speculation is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* (citing *Hooper*, 214 S.W.3d at 16).

If the evidence presented at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient to convict. *Richard Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). In circumstantial evidence cases, it is unnecessary for every fact to point directly and independently to the defendant's guilt; it is enough if the finding of guilt is warranted by the cumulative force of all of the incriminating circumstances. *Megan Winfrey*, 393 S.W.3d at 778; *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013).

An alternative - but equally fatal for the State - way of viewing this issue is to argue that the evidence was legally insufficient to show that TMIC's pecuniary interest had a value of $20,000 or more but less than $100,000. Section 32.46 of the Texas Penal Code, regarding securing execution of a document by deception, does not define the term "pecuniary interest." *See* Tex. Penal Code Ann., Sec. 32.46(a)(1). Thus, the term is to be given its plain and ordinary meaning. *See Goldstein*, 803 S.W.2d at 791. The Dallas court of appeals has stated that "pecuniary" is a synonym for "financial" and that "pecuniary interest" means a direct interest related to money. *Fisher v. State*, 803 S.W.2d 828, 830 (Tex. App.—Dallas 1991, pet. ref'd).

Logic demands that the State bear the burden of segregating the valid work from the allegedly fraudulent work. *See Sowders v. State*, 693 S.W.2d 448, 450 (Tex. Crim. App. 1985) (when the State alleges an exact value for stolen property, it

need not prove the exact value pled, but must only prove a value sufficient to satisfy the jurisdictional requirement of the State's pleading). *See Nitcholas v. State,* 524 S.W.2d 689, 691 (Tex. Crim. App. 1975).

Because the State failed to fully segregate the properly billed amounts from the amounts that were based on alleged deception or fraud, there was no legally sufficient evidence to establish the jurisdictional limits of this offense, and the State failed to satisfy its burden. *Sowders,* 693 S.W.2d at 450; *Nitcholas*, 524 S.W.2d at **691.** *See Lehman*, 792 S.W.2d at 84; *Simmons*, 109 S.W.3d at 472. *See also Lee*, 29 S.W.3d at 75. To hold otherwise would allow the jury to convict Appellant on conduct that was decidedly *not* fraudulent or deceptive. Rather, the jury had to speculate as to the amounts that were proper by giving "credits" to NTME. *See Lehman*, 792 S.W.2d at 84; *Simmons*, 109 S.W.3d at 472. *See also Lee*, 29 S.W.3d at 75.

### 4. A fatal variance existed between the State's pleading and proof regarding the form HCFA 1500.

The undisputed evidence established that the actual form submitted by NTME, and on which TMIC based its decision to pay NTME, was a CFS form, not an HCFA 1500 form. [3 RR14, 16, 27; State's Exhibit 3]

The variance at issue is a non-statutory fact defining an allowable unit of prosecution. *See Fuller v. State*, 73 S.W.3d 250, 257 (Tex. 2002) (Keller, P.J., concurring). The question is the method by which Appellant is alleged to have

committed an act of deception on which TMIC relied when executing a document. The testimony of Lena Shockley, NTME's office manager, illustrates that Appellant did not know why NTME's claims were being denied. [5 RR 60-68] Therefore, this Court should not conclude that the variance was immaterial; rather, this Court should enter a judgment of acquittal on this charge. *Id*., at 257.

## ISSUE TWO

**The trial court erred in refusing to admit evidence that TMIC provided funding to the State's prosecutors who prosecuted Appellant.**

### A. *A financial relationship exists between the State and TMIC.*

A financial relationship existed between the Travis County Criminal District Attorney's Office, and particularly with respect to the two prosecutors who handled this case against Appellant, and the alleged victim, Texas Mutual insurance Company ("TMIC"). TMIC pays for the salaries of two prosecutors, one paralegal and one part-time staff within the Workers' Compensation Fraud Unit of the DA's Public Integrity Unit. [5 RR 60-68] As a result, TMIC, the alleged victim in this case, actually pays the salaries of the two prosecutors – Ms. Donna Crosby and Ms. Meg Brooks – who prosecuted Appellant for this matter.

That financial relationship should have been disclosed to Appellant's counsel before trial. Furthermore, when Appellant's counsel learned that the purported "victim" of Appellant's alleged misconduct had funded the very staff that

prosecuted Appellant for this case, Appellant was entitled to present evidence to the jury of the financial relationship between TMIC and the State.

Based on the discovery of this information, Defendant's counsel informed the trial court of his desire to question Ms. Crosby, in front of the jury, about the financial relationship between TMIC and the DA's Office. [5 RR 60-83] However, the trial court denied Appellant the right to present evidence to the jury of the financial relationship between TMIC and the State. [5 RR 83]

By refusing to permit Appellant to present such evidence to the jury, the trial court committed reversible error.

### 1. Appellant first learned of a financial relationship between State and TMIC during trial.

At some point during the trial, and for reasons that Appellant's counsel cannot specifically recall, Appellant's counsel asked Ms. Donna Crosby, the lead attorney for the State, if there was some sort of relationship between TMIC and the Travis County Criminal District Attorney's Office ("DA's Office"). The record does not reflect whether Appellant's counsel asked Ms. Crosby specifically if TMIC provided funding to the DA's Office, or if he asked her a more general question that led to Ms. Crosby's eventual revelation that TMIC provides financial funding to the DA's office to prosecute allegations of worker's compensation fraud. Before that moment during trial, neither Ms. Crosby nor any other person representing the State had ever revealed to Appellant's counsel that TMIC provides funding to the DA's

office specifically for the salaries of Ms. Crosby and Ms. Brooks, and for the salaries of any other employees of the DA's office. [5 RR 60-68]

Before calling one of the State's witnesses out of order, and after the State had initially rested, State's attorney Donna Crosby informed the Court about Appellant's counsel's desire to call Ms. Crosby as a witness at trial:

> **Ms. Crosby** (to Court):. [Defense] Counsel has indicated that he wants to call me as a witness. I would request that be outside the hearing of the jury.
>
> **Court**: That's fine.

[5 RR 4]

After testimony from other witnesses, the trial court excused the jury and allowed testimony from Ms. Crosby regarding the State's unusual (and previously undisclosed) relationship with TMIC:

> **Appellant's counsel ("Q")**: And what division are you assigned to, or what section of the DA's office are you assigned to?
>
> **Ms. Crosby ("A")**: The Public Integrity Unit.
>
> **Q**: And how long have you been in that unit?
>
> **A**: Oh, I'd be guessing, but I'd say the bulk of my time in the DA's office has been in the Public Integrity Unit.
>
> **Q**: Now, you indicated to me that *Texas Mutual Insurance Company provides funding for your position*. Did I understand that correctly?
>
> **A**: My division.
>
> **Q**: Can you tell me how Texas Mutual Insurance Company provides funding for your division?

**A**: I really don't know, because I don't get myself involved in that process. I think that they deal with our admin people. Our admin people deal with whatever budget we're going to have, and they get that budget cleared with whoever they deal with over at TMI.

**Q**: What do you mean they get with budget people at TMI?

**A**: Well, TMI pays for the unit, but the administrative division of our office deals with that issue. I don't ever get involved in budget issues.

**Q**: Is it your understanding that Texas Mutual Insurance Company pays for the entire Public Integrity Unit?

**A**: No, not for the entire Public Integrity Unit.

**Q**: What is your understanding of what they pay for?

**A**: That would be speculation. All I know is that they pay for the unit, that being Worker's Comp Fraud Unit.

**Q**: Well, who is in the Worker's Comp Fraud Unit?

**A**: Well, my question – because I think it was a very broad question, and I'm trying to figure out – because I don't want to give misinformation.

**Court**: Are you asking how many attorneys work –

**Q**: I'm asking how many staff or attorneys are in the Worker's Comp Fraud Unit that Texas Mutual Insurance Company pays for.

**A**: Okay. There are two attorneys, currently a paralegal. And I think we still have a position open for a part-time office specialist. And I said "I think" because that particular position may change.

**Q**: And do you know how much it is – how much money it is each year that Texas Mutual Insurance Company provides?

**A**: No.

**Q**: But my question is: Of those three-and-a-half people, Texas Mutual Insurance Company provides 100 percent of the financing for them?

**A**: That could be true, but with a qualifier. There are other people who assist me, too, that are not funded by Texas Mutual.

**Q**: And do you prosecute workers' comp fraud cases when the carrier is different than Texas Mutual Insurance Company?

**A**: I have in the past. And I will do so in the future, if it's a situation where we can prosecute it.

**Q**: What percentage of your time do you think you spend on cases in which Texas Mutual Insurance Company is the victim, or the alleged victim, of insurance fraud?

**A**: So it depends on which case I'm working on at any particular time. . . . . But, if I had to do percentages this year, I think the bulk of my time this year has been spent on Texas Mutual cases. . . .

**Q**: Have you ever prosecuted – I don't mean go to trial, but have you ever prosecuted a case in which Texas Mutual Insurance Company was not at least one of the alleged victims? In other words, *in all your cases, is Texas Mutual always involved in the workers' comp fraud cases*?

**A**: With regard to workers' comp fraud, if I'm understanding your question, I have worked with other carriers, but I wouldn't say that it's the bulk of my workload. . . .

**Q**: *When you work with other carriers, is Texas Mutual Insurance Company always involved in those cases, also.*

A: *I believe so.*

**Q**: With the exception of that case that you tried, when you prosecute workers' compensation fraud case, is Texas Mutual Insurance Company always one of the alleged victims in that case?

**A**: Yes, one of the alleged victims, but there could be other victims.

**Q**: And how long has Texas Mutual Insurance Company been providing funding for your division.

**A**: Since it's inception.

**Q**: Since the inception of the unit?

**A**: Yes. In fact, I started the unit.

**Q**: So when did you start the Workers' Comp Fraud Unit?

**A**: I don't know. I think I've been doing it about 14 years.

**Q**: *And Texas Mutual Insurance Company has always provided funding at that time*?

**A**: *Yes*.

**Q**: And the Workers' Comp Fraud Unit is a subsection of the Public Integrity Unit?

**A**: Yes.

[5 RR 60-68] Ms. Crosby also testified that she presents her cases to the Grand Jury. [5 RR 70]

Following brief direct examination of Ms. Crosby by her co-counsel, the trial court had a long discussion with all counsel regarding whether the information about the financial relationship between TMIC and the Travis County Criminal District Attorney's Workers' Compensation Fraud Unit – as revealed by Ms. Crosby during her testimony – should be presented to the jury. [5 RR 70- 83] Appellant's counsel argued that such information was highly relevant to the case and should be admitted:

**Appellant's counsel**: Judge, I'll tell you, I tried to subpoena the General Counsel of Texas Mutual Insurance Company. She's out of the country. I didn't know this information, until Monday or Tuesday. It somehow came out in our discussion.

**Ms. Crosby**: It's not something I would hide, so I just told you.

**Appellant's counsel**: Well, it's certainly exculpatory, and the jury should know this information. It's certainly relevant. If it's not exculpatory, it certainly is relevant to the motivation of this lawsuit.

**Court**: Well, it's certainly is not exculpatory.

**Appellant's counsel**: It's not exculpatory. It's relevant. I guess it could be considered exculpatory, if the jury believes that it diminishes the reasons why this case is brought in the first place. And that's going to fit into my argument. I promise you that. So I think it should come in. It's absolutely relevant. I've never heard it happen in any other criminal case, where you have the alleged victim providing the funding for the prosecutors who are bringing the case against your client. That just doesn't happen, outside of this context. And it's not something that was available from Texas Mutual's website, or from any of the blurbs on the blogs or press releases that they issue on their various successes from Ms. Crosby on behalf of the Texas Mutual Insurance Company. It was not clear to me that there was that connection. So I didn't find about it, until Monday or Tuesday [*trial started on Monday*].

**Court**: All right. So you think that it's important to get in front of the jury the fact that the prosecutor is paid her salary, basically, by virtue of Texas Mutual Insurance?

**Appellant's counsel**: Not only that they pay her salary, but that the majority of cases she works on, the vast majority of the cases she works on, include Texas Mutual Insurance Company as one of the alleged victims.

[5 RR 68–73] The parties argued strenuously over whether information about the State's financial relationship with the alleged victim, TMIC, should be admitted into evidence:

**Ms. Crosby**: Well, how is that relevant as to whether or not he committed the crime?

**Court**: Right. I guess that's the issue.

**Appellant's counsel**: I don't mean any offense, but I certainly can make the argument: If you've got your own counsel, who can come and use the threat of criminal prosecution, as opposed to just a civil fraud case, as your attorney, because you're paying for them, you are supporting this unit, that is powerful information that the jury ought to find out.

**Ms. Crosby**: I work for the DA's office. I don't work for Texas Mutual.

**Appellant's counsel**: And she gets to tell them that, Your Honor. But they ought to at least have that information to say: Hey, if the only tool in the toolbox is a hammer, maybe everybody looks like a nail. You know, if they've got somebody who is willing to use criminal prosecution as a threat to these folks out here who are doing stuff, that's a pretty powerful incentive.

[5 RR 73-74]

The Court stated that he would not permit such information to be admitted in front of the jury, even if Appellant tried to call a witness other than the prosecutor, Ms. Crosby, to testify about the relationship between TMIC and the State:

**Appellant's counsel**: So you're granting the State's motion to exclude any evidence about the relationship between the DA's office and Texas Mutual Insurance Company, in which Texas Mutual Insurance Company provides funding for two prosecutors and one paralegal and a part-time person in the Workers' Comp Fraud Unit?

**Court**: It does seem to me that it is irrelevant. And in terms of Rule 401, it's not relevant. Also, even if relevant, it clearly is a violation of 403, so I will be excluding that.

[5 RR 77-83]

    **2.**       **Ethical standards prohibiting conflicts of interest between State**

**and an alleged victim made TMIC's relationship relevant.**

The American Bar Association ("ABA") Criminal Justice Standards.

According to these standards:

If the law of the jurisdiction permits the acceptance of financial or resource assistance from non-governmental sources, the decision to accept such assistance should be made with caution by the chief public prosecutor or an accountable designee after careful consideration of:

(i)     The extent to which the law of the jurisdiction permits the acceptance of financial or resource assistance;

(ii)    The extent to which the offer is in the public interest, as opposed to an effort to achieve the limited private interests of the non-governmental sources;

(iii)   The extent to which acceptance may result in foregoing other cases;

(iv)    The potential adverse impact on the equal administration of the criminal law;

(v)     The extent to which the character and magnitude of the assistance might unduly influence the prosecutor's subsequent exercise of investigative and prosecutorial discretion;

(vi)    The likelihood that the community may view accepting the assistance as inconsistent with the fair and equal administration of criminal justice;

(vii)   The likelihood that accepting assistance from private sources may create an appearance of undue influence over law enforcement; and

(viii)  The extent to which financial or resource assistance would enhance or enable the investigation of criminal activity.

Standards, Section 2.17(b), a true and correct copy of which is attached hereto as

Appendix 1.

The ABA's Standards go on to state:

The prosecutor, consistent with the law of the jurisdiction, should disclose significant non-governmental assistance to relevant legislative or public bodies having oversight over the prosecutor's office and, when appropriate, the public.

ABA Standards, Section 2.17(e) (emphasis added).

More importantly, the ABA Standards also state:

Non-governmental assistance should be disclosed to affected parties as part of the discovery process.

ABA Standards, Section 2.17(f) (emphasis added).

The actions of the State in accepting a grant from TMIC to fund the very prosecution at issue in this case essentially constitutes an improper delegation of the prosecutor's public duties to a private attorney for TMIC. Even though Ms. Crosby is, ostensibly, an employee of the DA's office and not of TMIC, it is clear that a primary part of her duties as a prosecutor for the Travis County Criminal District Attorney's Office is to prosecute allegations of fraud against TMIC. (TMIC is always a "victim" in cases that Ms. Crosby prosecutes involving workers' compensation fraud).

The decisions made by a prosecutor in setting enforcement priorities have far reaching impact on commerce, politics, and the everyday lives of those who must order their conduct and behave accordingly. Roger A. Fairfax, Jr., *Delegation of the Criminal Prosecution Function to Private Actors*," 43 University of California-

Davis L. J. 411, 428 (2009).  Prosecutorial decisions regarding whether and what to

investigate and what tactics and tools to use in the course of an investigation can

have grave consequences for those who fall under the government's scrutiny.  Id.

Virtually all of the decisions made by a prosecutor to prosecute an individual

for alleged criminal activity are, "for the most part, unreviewable."  *Id*., at p. 429.

As a result, a public prosecutor has a remarkable impact on the lives and liberty of

those in society who fall within the law's mandates.  *Id*., at p. 430.  The United

States Supreme Court observed the unique position of the public prosecutor in

*Berger v. United States*:

> The United States attorney is the representative not of an ordinary party to a
> controversy, but of a sovereignty whose obligation to govern impartially is as
> compelling as the obligation to govern at all; and whose interest, therefore, in
> a criminal prosecution is not that it shall win a case, but that justice shall be
> done.

295 U.S. 78, 88 (1935).  Fifty years after its decision in *Berger*, the Supreme Court

affirmed the obligation of a public prosecutor to strive toward justice above all else:

> Between the private life of the citizen and the public glare of criminal
> accusation stands the prosecutor.  That state official has the power to employ
> the full machinery of the state in scrutinizing any given individual.  Even if a
> defendant is ultimately acquitted, forced immersion in criminal investigation
> and adjudication is a wrenching disruption of everyday life.  <u>For this reason,
> we must have assurance that those who would wield this power will be guided
> solely by their sense of public responsibility for the attainment of justice</u>.

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987)

(emphasis added).

According to Professor Fairfax, the impartiality to be exercised by a public prosecutor constitutes a bedrock principle of our criminal justice system:

> [T]he public prosecution norm – the notion that criminal prosecution authority properly rests exclusively with the state – is a source of legitimacy for the criminal justice system. The fact that prosecutions are brought not in the name of an individual but in the name of the state both requires and produces public confidence in the criminal process. In the same vein, that the actor wielding criminal prosecutorial authority is a public lawyer is of tremendous significance.

Fairfax, "*Delegation*," 43 UC-Davis L. J. at p. 433. As Professor Fairfax stated, "[I]t does not take much imagination to envision the potential for corruption and conflicts of interest when a lawyer who controls the tremendous power of criminal investigation and prosecution also represents private clients." *Id*., at p. 438 (citation omitted).

Professor Fairfax's article addressed the potential for conflicts of interest in a jurisdiction that permits its public prosecutor to maintain a part-time private practice, which is not the case here. *See Id*., at p. 413. However, the facts, adduced outside the presence of the jury during the middle of trial, and discovered by Appellant's counsel quite by accident, reveals that the State has a unique financial arrangement with the alleged "victim," TMIC, and should be treated as if the State acted in this case as TMIC's private counsel.

It follows that if an alleged crime victim provides financial support to a state prosecuting authority, a defendant who is being prosecuted by that state prosecuting

authority should: (1) be informed prior to trial of the financial relationship between the alleged crime victim and the prosecutor; and (2) be permitted to adduce evidence at trial of the financial relationship between the prosecutor and the alleged crime victim.

Such information is not only relevant; it may be among the MOST relevant information in the case.

**3.     Trial court committed harmful error by refusing to permit Defendant to present evidence of the relationship between the State and TMIC.**

Evidentiary rulings admitting or excluding evidence are committed to the trial court's sound discretion.  Reasonable minds can differ on issues such as the relevance of a particular piece of evidence, and as long as the trial court's ruling was at least within the zone of reasonable disagreement, an appellate court should not substitute its reasonable perception for that of the trial judge.  *See Montgomery v. State*, 810 S.W.2d 272, 291 (Tex.Crim.App. 1990) (op'n on rehearing).

In this case, the trial court's exclusion of evidence about the financial relationship between the State and TMIC, the alleged victim, was painfully relevant. The jury should have been allowed to know that TMIC paid the salaries of the two prosecutors who were prosecuting Appellant for his alleged fraudulent conduct against TMIC, especially when in-house fraud investigators from TMIC, rather than an independent law enforcement agency, had conducted the investigation that led to

Appellant being indicted by Ms. Crosby, who testified that she presents her own cases to the Grand Jury. A jury reasonably could have inferred that the DA's office acted as the personal attorneys for TMIC with respect to this case, and such a revelation would have complemented Appellant's argument that TMIC was strong-arming Appellant because it did not want to compensate him for the full 16 units that Appellant believed was compensable.

The State should have disclosed information about its financial relationship with TMIC to Appellant well before trial, but the trial court certainly should have allowed Appellant to present to the jury evidence of the relationship between TMIC and the two prosecutors who brought this case.

No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the error complained of probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000); *Beam v. A.H. Chaney, Inc.*, 56 S.W.3d 920, 924 (Tex. App.—Fort Worth 2001, pet. denied) (court found no harmful error after holding that evidence should have been excluded pursuant to Rule 193.6[a]).

The trial courts exclusion of any testimony regarding the financial relationship between TMIC and the State constituted harmful error, and this matter should be reversed and remanded for a new trial.

# IV.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant Howard Thomas Douglas moves this Court to reverse the verdict and judgment of the trial court and render a verdict of not guilty in favor of Appellant,; or, in the alternative, find that the trial court erred in excluding evidence of the financial relationship between the State and the alleged victim, and remand this matter to the trial court for a new trial.

Respectfully submitted,

/S/ Craig M. Price
Craig M. Price
State Bar No. 16284170
cmp@hammerle.com
Hammerle Finley Law Firm
2871 Lake Vista Dr., Suite 150
Lewisville, Texas 75067
Tel: (972) 436-9300
Fax: (972) 436-9000
Attorney for Appellant

## CERTIFICATE OF SERVICE

This is to certify that on April 23, 2015, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Travis County, PO Box 1748, Austin, Texas 78767, by electronic e-service.

/S/ Craig M. Price
Craig M. Price

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies, pursuant to Tex. R. App. 9.4(i)(4), that the foregoing Appellant's Brief contains a total of 11, 395 words.

/S/ Craig M. Price
Craig M. Price

# APPENDIX

1. Judgment of Conviction by Jury

2. Charge of the Court

3. ABA Standards on Prosecutorial Investigations

CASE NO. D-1-DC-12-900059    COUNT I
INCIDENT NO./TRN: 0119803593

| THE STATE OF TEXAS | § | IN THE 331ST DISTRICT |
| | § | |
| V. | § | COURT |
| | § | |
| HOWARD THOMAS DOUGLAS | § | TRAVIS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX05456675 | § | |

## JUDGMENT OF CONVICTION BY JURY

| Judge Presiding: | HON. BOB PERKINS | Date Judgment Entered: | 6/19/2014 |
| Attorney for State: | DONNA CROSBY | Attorney for Defendant: | CRAIG PRICE |

Offense for which Defendant Convicted:
**SECURING EXECUTION OF A DOCUMENT BY DECEPTION**

| Charging Instrument: | Statute for Offense: |
| INDICTMENT | 32.46 (b)(5) Penal Code |

Date of Offense:
**12/20/2007 THROUGH 12/16/2009**

| Degree of Offense: | Plea to Offense: |
| 3RD DEGREE FELONY | NOT GUILTY |
| Verdict of Jury: | Findings on Deadly Weapon: |
| GUILTY | N/A |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punished Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
| COURT | 6/19/2014 | 6/19/2014 |

| Punishment and Place of Confinement: | **FIVE (5) YEARS INSTITUTIONAL DIVISION, TDCJ** |

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR         .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
| $ | $ 354.00 | $ | ☐ VICTIM (see below)  ☒ AGENCY/AGENT (see below) |

☒ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A** .

| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
| | From **6/6/2013** to **6/8/2013**    From    to    From    to |
| Time Credited: | From    to    From    to    From    to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | **N/A DAYS    NOTES: N/A** |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Travis County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

190

**APPENDIX 1**

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

### Punishment Assessed by Jury / Court / No election (select one)

☐ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☒ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

### Punishment Options (select one)

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ.** The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the TRAVIS COUNTY DISTRICT CLERK'S OFFICE, 509 WEST 11TH ST. SUITE 1.400. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of **Travis County, Texas** on the date the sentence is to commence. Defendant shall be confined in the **Travis County Jail** for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the TRAVIS COUNTY SHERIFF'S BONDING OFFICE, 509 WEST 11TH ST. SUITE 1.600. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the **Travis County Sheriff.** Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

### Execution / Suspension of Sentence (select one)

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

### Furthermore, the following special findings or orders apply:

Signed and entered on June 23, 2014

X _____
**331ST**
JUDGE PRESIDING

Clerk: MM

Right Thumbprint

191

D1DC 12 900059

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN THE 331st DISTRICT |
| VS. | )( | COURT OF |
| HOWARD THOMAS DOUGLAS | )( | TRAVIS COUNTY, TEXAS |

## CHARGE OF THE COURT

Ladies and Gentlemen of the Jury:

The defendant, HOWARD THOMAS DOUGLAS, stands charged by indictment with the offense of securing execution of document by deception, alleged to have been committed in Travis County, Texas, beginning on or about the 20th day of December, 2007, and continuing to on or about the 16th day of December, 2009 . To this charge the defendant has pleaded not guilty. You are instructed that the law applicable to this case is as follows:

I.

A person commits the offense of securing the execution of a document by deception if, with intent to defraud or harm any person, he, by deception, causes another to sign or execute any document affecting property or service or the pecuniary interest of any person.

II.

"Deception" means creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another, in the transaction, and that the defendant does not believe to be true;

III.

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

IV.

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor was clearly insufficient.

A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:

(1) a different offense was committed; or

(2) a different person or property was injured, harmed, or otherwise affected.

Filed in The District Court
of Travis County, Texas

MAY 1 ⬤ 2014

At___2:00 P.___M.

Amalia Rodriguez-Mendoza, Clerk

**APPENDIX 2**

## V.

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that the defendant, HOWARD THOMAS DOUGLAS as alleged in the indictment, pursuant to one scheme or continuing course of conduct which began on or about the 20th day of December, 2007, and continuing to on or about the 16th day of December, 2009, in Travis County, Texas, said defendant did then and there with intent to defraud or harm the TEXAS MUTUAL INSURANCE COMPANY, by deception create or confirm by words or conduct a false impression of fact, to wit: the said Howard Thomas Douglas caused to be submitted to the TEXAS MUTUAL INSURANCE COMPANY a form HCFA (Health Care Financing Administration) 1500 seeking payment for services rendered, said services were as follows : 16 units billed under CPT (current procedural terminology) code 97750, when in fact, 16 units of service were not rendered in accordance with the Texas Department of Insurance Division of Workers Compensation Medical Fee Guidelines not believing it to be true, that was likely to affect the judgment of the said Texas Mutual Insurance Company in the transaction, which deception caused the Texas Mutual Insurance Company to sign or execute documents affecting its property, service or pecuniary interest, where the value of the property, service or pecuniary interest was more than $20,000 but less than $100,000 and said payments are of the tenor following :

172

| Name | Date of Service or HCFA Date | Amount Charged | Amount Paid |
|---|---|---|---|
| VESS, CHUCK | 3/20/2008 | $612.00 | $533.76 |
| GILLINGHAM, MARK | 5/26/2009 | $612.00 | $337.84 |
| ESPARZA, JAVIER | 3/13/2008 | $612.00 | $580.16 |
| BLANTON, MARCUS | 5/20/2008 | $612.00 | $592.32 |
| BOOTH, CHAD L. | 2/8/2009 | $612.00 | $612.00 |
| ETTINGER, BRAD | 2/26/2008 | $612.00 | $533.76 |
| THOMAS, FRANKIE L. | 1/15/2009 | $612.00 | $612.00 |
| BOLES, BARBARA | 4/28/2009 | $612.00 | $612.00 |
| MORENO, ALBERT | 5/8/2008 | $612.00 | $592.32 |
| HARRISON, EUNICE | 2/23/2009 | $612.00 | $612.00 |
| LOWERY, BILLY L. | 1/22/2009 | $612.00 | $612.00 |
| RODRIQUEZ, GUADALUPE | 4/22/2008 | $612.00 | $592.32 |
| SHEEHAN, MICHAEL | 5/1/2008 | $612.00 | $533.76 |
| HEARD, LEE A. | 4/9/2009 | $612.00 | $296.24 |
| BITNER, JESSE | 3/20/2008 | $612.00 | $592.32 |
| LIEBEL, LAURIE | 1/21/2009 | $612.00 | $612.00 |
| POZOS, NICOLAS | 5/12/2008 | $612.00 | $592.32 |
| PARKER, CHARLOTTE | 6/10/2008 | $612.00 | $592.32 |
| FIERRO, MACLOVIO V. | 5/8/2008 | $612.00 | $592.32 |
| GREASON, RICHARD | 4/10/2008 | $612.00 | $612.00 |
| DAVIS, PATRICK M. | 2/26/2008 | $612.00 | $533.76 |
| DOCKRAY, JERRY | 3/9/2009 | $612.00 | $612.00 |
| MCGAHEY, TERI | 4/22/2008 | $612.00 | $592.32 |
| TALLEY, JUSTIN | 4/14/2008 | $612.00 | $592.32 |
| SHORT, WENDELL R. | 4/22/2008 | $612.00 | $222.12 |
| SHORT, WENDELL R. | 4/22/2008 | $612.00 | $370.36 |
| CHARLES, TONY | 5/26/2009 | $612.00 | $612.00 |

173

| | | | |
|---|---|---|---|
| THOMPSON, WILLIAM | 5/12/2008 | $612.00 | $592.32 |
| MERCER, JACKIE | 4/14/2008 | $612.00 | $592.32 |
| CAMACHO, JULIE | 2/2/2009 | $612.00 | $612.00 |
| WILSON, JAMES | 3/3/2008 | $612.00 | $533.76 |
| WHITE, LISA A. | 5/20/2008 | $612.00 | $592.32 |
| HELLAM, ROBERT L. | 5/4/2009 | $612.00 | $490.44 |
| ARMSTRONG, SHANA M. | 2/26/2008 | $612.00 | $533.76 |
| CLAYTON, FRANKLIN D. | 2/12/2009 | $612.00 | $612.00 |
| PAWLOWSKI, PIOTR | 6/5/2008 | $612.00 | $592.32 |
| GALLAMORE, CARNIE M | 3/24/2008 | $612.00 | $533.76 |
| GALLAMORE, CARNIE M | 3/24/2008 | $612.00 | $533.76 |
| MEDLEY, GARY | 4/3/2008 | $612.00 | $592.32 |
| THOMAS, SHERMAN | 5/13/2008 | $612.00 | $612.00 |
| GROUNDS, GEORGE G | 5/8/2008 | $612.00 | $592.32 |
| CALDWELL, JOHN | 4/22/2008 | $612.00 | $592.32 |
| MORQUECHO, CARMEN | 5/8/2008 | $612.00 | $592.32 |
| GOFF, TRICIA | 5/20/2008 | $612.00 | $592.32 |
| VASQUEZ, PEDRO | 4/18/2009 | $612.00 | $612.00 |
| MILLER, MARVIN | 5/8/2008 | $612.00 | $592.32 |
| GONZALEZ, ROBERTO | 4/14/2008 | $612.00 | $592.32 |
| JOHNSON, CHARLES G. | 6/17/2009 | $612.00 | $612.00 |
| INFANTE, JULIAN | 6/5/2008 | $612.00 | $592.32 |
| FLORES, JANIE | 3/25/2009 | $612.00 | $612.00 |
| FARR, KEVIN | 10/21/2008 | $612.00 | $592.32 |
| WATSON, CHET | 5/8/2008 | $612.00 | $592.32 |
| FALCON, SHANNA | 4/14/2009 | $612.00 | $612.00 |
| RAY, JAY | 5/28/2008 | $612.00 | $592.32 |
| KINNAIRD, JANICE | 2/23/2009 | $612.00 | $612.00 |

174

| | | | |
|---|---|---|---|
| NARANJO, FRED | 2/11/2009 | $612.00 | $612.00 |
| BLACKSHIRE, RONALD | 4/15/2009 | $612.00 | $612.00 |
| STORME, RAYMOND | 3/17/2009 | $612.00 | $612.00 |
| ARREDONDO, RAMIRO D. | 3/31/2009 | $612.00 | $612.00 |
| MORA, ANTONIO | 4/16/2009 | $612.00 | $612.00 |
| WILKERSON, TOMMY R. | 4/15/2009 | $612.00 | $612.00 |
| GUZMAN, ELIGIO | 2/23/2009 | $612.00 | $519.60 |
| COOK, FRANCES | 3/26/2009 | $612.00 | $326.96 |
| RODRIGUES, RUDOLPH | 6/15/2009 | $612.00 | $612.00 |
| WASHBURN, TRACY W. | 2/5/2009 | $612.00 | $612.00 |
| HOLLAND, WILLIAM E | 4/28/2009 | $612.00 | $612.00 |
| BEAN, ROBERT N. | 3/13/2009 | $612.00 | $326.96 |
| HUNNICUTT, CYNTHIA D. | 7/7/2009 | $612.00 | $612.00 |
| FYVIE, GARY M. | 2/2/2009 | $612.00 | $612.00 |
| MOTTA BERRIOS, CARLOS | 5/12/2009 | $612.00 | $521.40 |
| LOEFFLER, RODNEY R. | 2/23/2009 | $612.00 | $612.00 |
| MUNGUIA, BARBARA L. | 5/7/2009 | $612.00 | $612.00 |
| ALTON, JAMES | 5/14/2009 | $612.00 | $612.00 |
| PARR, JOSEPH G | 5/21/2009 | $612.00 | $612.00 |
| SIMPSON, MONTE L. | 2/26/2009 | $612.00 | $612.00 |
| SMITH, KEITH W. | 2/16/2009 | $612.00 | $612.00 |
| KALA, PABLO JR | 2/11/2009 | $612.00 | $612.00 |
| THOMPSON, TIMMY R. | 1/8/2009 | $612.00 | $612.00 |
| JARAMILLO, EFRAIN | 5/1/2009 | $612.00 | $612.00 |
| ROSE, DELLRON K. | 3/26/2009 | $612.00 | $612.00 |
| OVALLE, CAMELIA R. | 1/30/2009 | $612.00 | $612.00 |
| COLBERT, MICHAEL | 5/7/2009 | $612.00 | $612.00 |
| DOMANSKI, CHRIS | 5/28/2009 | $612.00 | $612.00 |

175

| | | | |
|---|---|---|---|
| GOMEZ, JIMMY C. | 2/23/2009 | $612.00 | $612.00 |
| THURMOND, MICHAEL | 5/21/2009 | $612.00 | $326.96 |
| CRIPE, TERRY W. | 4/15/2009 | $612.00 | $612.00 |
| BEAVERS, DONALD K. | 2/23/2009 | $612.00 | $612.00 |
| THOMPSON, DAVID L. | 7/9/2009 | $612.00 | $612.00 |
| HOKE, AARON | 3/6/2009 | $612.00 | $612.00 |
| YOUNG, DARRELL | 6/15/2009 | $612.00 | $612.00 |
| WOODARD, EVAN | 7/7/2009 | $612.00 | $612.00 |
| WALKER, JAMES | 3/25/2009 | $612.00 | $519.60 |
| WALKER, JAMES | 6/30/2009 | $612.00 | $612.00 |
| ZURITA, LOUISETTE | 4/7/2009 | $612.00 | $612.00 |
| GARZA, CUAUHTEMOC | 4/9/2009 | $612.00 | $612.00 |
| GUZMAN, LUIS G. | 2/18/2009 | $612.00 | $612.00 |
| GARCIA, PEDRO | 4/28/2009 | $612.00 | $612.00 |
| MAGNER, MARTIN | 3/13/2009 | $612.00 | $612.00 |
| LEAL, RENE M. | 5/26/2009 | $612.00 | $346.40 |
| TUNNELL, JESSE | 3/25/2009 | $612.00 | $612.00 |
| VASQUEZ, ROGELIO T. | 3/30/2009 | $612.00 | $612.00 |
| GARZA, DIEGO | 3/27/2009 | $612.00 | $612.00 |
| GILLESPIE, MARTIN | 4/28/2009 | $612.00 | $612.00 |
| CHICO, REBEKAH | 1/29/2009 | $612.00 | $612.00 |
| DELEON, TOMAS | 7/7/2009 | $612.00 | $612.00 |
| REYNA, JESSE | 4/14/2009 | $612.00 | $612.00 |
| CARILLO, RODRIGO | 5/4/2009 | $612.00 | $612.00 |
| TURNER, JAY | 4/14/2009 | $612.00 | $612.00 |
| NEVILLES, GARY II | 6/2/2009 | $612.00 | $612.00 |
| PERKINS, ROBERT J. | 3/10/2009 | $612.00 | $612.00 |
| HERNANDEZ, JOSSIAS M | 5/21/2009 | $612.00 | $612.00 |

176

| | | | |
|---|---|---|---|
| TORRES, MARGARITO | 4/9/2009 | $612.00 | $612.00 |
| MCKINNEY, LEVI | 4/14/2009 | $612.00 | $612.00 |
| ROSAS, DANNY | 6/4/2009 | $612.00 | $612.00 |
| JOHNSON, TIMOTHY | 5/27/2009 | $612.00 | $612.00 |
| WISE, JAMES A | 6/18/2009 | $612.00 | $612.00 |
| MASCORRO, ROBERT E. | 6/1/2009 | $612.00 | $612.00 |
| REID, BONITA | 6/3/2009 | $612.00 | $612.00 |
| TORRES, JUAN M. | 6/18/2009 | $612.00 | $612.00 |
| JACKSON, JOANN | 4/23/2009 | $612.00 | $612.00 |
| ESTRADA, JUAN | 4/22/2009 | $612.00 | $612.00 |
| MERAZ, JESUS | 6/18/2009 | $612.00 | $612.00 |
| TROUT, SANDRA K. | 5/26/2009 | $612.00 | $612.00 |
| WEESE, NANCY K. | 5/5/2009 | $612.00 | $612.00 |
| WHITFIELD, NORMA J. | 7/2/2009 | $612.00 | $612.00 |
| TURNER, JOHN R. | 9/22/2009 | $612.00 | $520.20 |
| FISHER, DEREK | 10/22/2009 | $612.00 | $347.68 |
| DE GRACIA, PAUL | 9/16/2009 | $612.00 | $612.00 |
| FRANCO, MIGUEL | 11/20/2009 | $612.00 | $612.00 |
| WHITLEY, KATHLEEN | 12/2/2009 | $612.00 | $612.00 |
| DAVIDSMEYER, ROBERT L. | 10/13/2009 | $612.00 | $6.12 |
| DAVIDSMEYER, ROBERT L. | 10/13/2009 | $612.00 | $605.88 |
| BOATRIGHT, DANNY | 11/7/2009 | $612.00 | $612.00 |
| BAKER, LORIN | 10/22/2009 | $612.00 | $347.68 |
| HILL, FRANK | 9/16/2009 | $612.00 | $612.00 |
| RICCI, CORINNE | 10/13/2009 | $612.00 | $612.00 |
| GUTIERREZ, ADAN | 10/9/2009 | $612.00 | $612.00 |
| STOUT, TIMOTHY E. SR | 11/19/2009 | $612.00 | $520.20 |
| CAGE, VERNON | 12/16/2009 | $612.00 | $520.20 |



| | | | |
|---|---|---|---|
| GODFREY, BEATRICE | 10/2/2009 | $612.00 | $612.00 |
| VANOS, BRANDON | 10/27/2009 | $612.00 | $612.00 |
| GARCIA-BURCIAGA, ALFONS | 9/15/2009 | $612.00 | $612.00 |
| | | | |
| | | | |
| | | | |
| | | | |

Against the peace and dignity of the State.

Donna Beth McCormick
Foreperson of the Grand Jury

178

you will find the defendant, HOWARD THOMAS DOUGLAS, guilty of the offense of Securing Execution of a Document by Deception and so say by your verdict, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

## VI.

You are further charged as a part of the law in this case that the state is not required to prove the exact date alleged in the indictment but may prove the offense, if any, to have been committed at any time prior to the presentment of the indictment so long as said offense, if any, occurred within seven years of the date of the Presentment of the indictment ; you are further instructed that the day the indictment was presented and the day of the offense, if any, occurred, shall not be computed within the seven year limitation period.

## VII.

A conviction cannot be had upon the testimony of an accomplice unless the jury first believe that the accomplice's evidence is true and that it shows the defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

You are further instructed that the testimony of one accomplice witness is not sufficient corroboration of the other's testimony.

You are further instructed that mere presence of the accused in the company of an accomplice witness shortly before or after the time of the offense, if any, is not, in itself, sufficient corroboration of the accomplice witness' testimony.

You are charged that Tamara Wells and Lena Shockley were accomplices if any offense was committed, and you are instructed that you cannot find the defendant guilty upon the testimony of Tamara Wells and Lena Shockley unless you first believe that the testimony of the said Tamara Wells and Lena Shockley is true and that it shows the defendant is guilty as charged in the indictment; and even then you cannot convict the defendant, Howard Thomas Douglas , unless you further believe that there is other evidence in this case, outside the evidence of said Tamara Wells and Lena Shockley , tending to connect the defendant with the commission of the offense charged in the indictment and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

## VIII.

In all criminal cases, the burden of proof is on the State. All persons are presumed innocent and no person may be convicted unless each element of the offense is proved beyond a reasonable doubt. The fact that the defendant has been arrested, confined, or indicted for, or otherwise charged with an offense gives rise to no inference of guilt at his trial. The law does not require the defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant unless the jurors are satisfied beyond a

reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant. It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecutor's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit the defendant and say by your verdict "Not Guilty."

In a criminal case the law permits a defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him. You will, therefore, not consider the fact that the defendant did not testify as a circumstance against him; and you will not in your retirement to consider your verdict allude to, comment on, or in any manner refer to the fact that the defendant has not testified.

You are further instructed as a part of the law in this case that the indictment against the defendant is not evidence in the case, and that the true and sole use of the indictment is to charge the offense, and to inform the defendant of the offense alleged against him. The reading of the indictment to the jury in the statement of the case of the state against the defendant cannot be considered as a fact or circumstance against the defendant in your deliberations.

In deliberating on the cause you are not to refer to or discuss any matter or issue not in evidence before you; and in determining the guilt or innocence of the defendant, you shall not

180

discuss or consider the punishment, if any, which may be assessed against the defendant in the event he is found guilty beyond a reasonable doubt.

You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein, and no juror is permitted to communicate to any other juror anything he may have heard regarding the case or any witness therein, from any source other than the witness stand.

You are instructed that your verdict must be unanimous and it must reflect the individual verdict of each individual juror, and not a mere acquiescence in the conclusion of the other jurors.

You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony, but you are bound to receive the law from the Court, which is herein given you, and be governed thereby. A juror may believe any, all, none or part of any evidence given by any witness.

You are instructed that upon your request to the bailiff you shall be furnished any exhibits admitted as evidence in the case.

After the reading of this charge, you shall not be permitted to separate from each other nor shall you talk to anyone not of your jury. After argument of counsel, you will retire and select one of your members as your foreperson. It is his or her duty to preside at your deliberations and to vote with you in arriving at a unanimous verdict. After you have arrived at your verdict, you may use the forms attached hereto by having your foreperson sign his or her name to the form that reflects your verdict but in no event shall he or she sign more than one of such forms.

BOB PERKINS, Presiding Judge

181

D1DC 12 900059

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN THE 331st DISTRICT |
| VS. | )( | COURT OF |
| HOWARD THOMAS DOUGLAS | )( | TRAVIS COUNTY, TEXAS |

## VERDICT OF THE JURY

We, the jury, find the defendant, HOWARD THOMAS DOUGLAS, guilty of the offense of Securing Execution of a Document by Deception as alleged in the indictment.

_Leena O Ball_

FOREPERSON OF THE JURY

_Teena O Ball_

Printed name

182

D1DC 12 900059

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN THE 331st DISTRICT |
| VS. | )( | COURT OF |
| HOWARD THOMAS DOUGLAS | )( | TRAVIS COUNTY, TEXAS |

## VERDICT OF THE JURY

We, the jury, find the defendant, HOWARD THOMAS DOUGLAS, not guilty.

_____
FOREPERSON OF THE JURY

_____
Printed name

183



Home > Publications > Criminal Justice Section Archive

Criminal Justice Section Standards

## Standards on Prosecutorial Investigations (Table of Contents)

*P rosecutorial Investigations* is the subject of a new set of ABA Criminal Justice Standards approved by the ABA House of Delegates in February 2008.  To go directly to individual "black letter" standards, click on the applicable link in the Table of Contents, below. Commentary to these Standards is currently being developed and once it is approved by the Standards Committee will accompany these "black letter" Standards in a published volume.

### TABLE OF CONTENTS

**PREAMBLE**

**PART 1: GENERAL STANDARDS**

STANDARD 1.1 The Function of These Standards

STANDARD 1.2 General Principles

STANDARD 1.3 Working With Police and Other Law Enforcement Agents

STANDARD 1.4 Victims, Potential Witnesses, and Targets During the Investigative Process

STANDARD 1.5 Contacts with the Public During the Investigative Process


**PART 2: Standards for Specific Investigative Functions of the Prosecutor**

STANDARD 2.1 The Decision to Initiate or to Continue an Investigation

STANDARD 2.2 Selecting Investigative Techniques

STANDARD 2.3 Use of Undercover Law Enforcement Agents and Undercover Operations

STANDARD 2.4 Use of Confidential Informants

**APPENDIX 3**

STANDARD 2.5 Cooperation Agreements and Cooperating Individuals and Organizational Witnesses

STANDARD 2.6 The Decision to Arrest During a Continuing Criminal Investigation

STANDARD 2.7 Use of Subpoenas

STANDARD 2.8 Search Warrants

STANDARD 2.9 Use of the Investigative Powers of the Grand Jury

STANDARD 2.10 Technologically-Assisted Physical Surveillance

STANDARD 2.11 Consensual Interception, Transmission and Recording of Communications

STANDARD 2.12 Non-Consensual Electronic Surveillance

STANDARD 2.13 Conducting Parallel Civil and Criminal Investigations

STANDARD 2.14 Terminating the Investigation, Retention of Evidence and Post- Investigation Analysis

STANDARD 2.15 Guidance and Training for Line Prosecutors

STANDARD 2.16 Special Prosecutors, Independent Counsel and Special Prosecution Units

STANDARD 2.17 Use of Information, Money, or Resources Provided by Non- Governmental Sources

STANDARD 2.18 Use of Sensitive, Classified or Other Information Implicating Investigative Privileges

**PART 3: PROSECUTOR'S ROLE IN RESOLVING INVESTIGATION PROBLEMS**

STANDARD 3.1 Prosecutor's Role in Addressing Suspected Law Enforcement Misconduct

STANDARD 3.2 Prosecutor's Role in Addressing Suspected Judicial Misconduct

STANDARD 3.3 Prosecutor's Role in Addressing Suspected Misconduct by Defense Counsel

STANDARD 3.4 Prosecutor's Role in Addressing Suspected Misconduct by Witnesses, Informants or Jurors

STANDARD 3.5 Illegally Obtained Evidence

STANDARD 3.6Responding to Political Pressure and Consideration of the Impact of Criminal Investigations on the Political Process

STANDARD 3.7 Review and Oversight of Criminal Investigations by Government Agencies and Officials

## Standards on Prosecutorial Investigations (Text)
### ABA Standards for Criminal Justice: Prosecutorial Investigations
### Approved February 2008

## Preamble

A prosecutor's investigative role, responsibilities and potential liability are different from the prosecutor's role and responsibilities as a courtroom advocate. These Standards are intended as a guide to conduct for a prosecutor actively engaged in a criminal investigation or performing a legally mandated investigative responsibility, e.g., serving as legal advisor to an investigative grand jury or as an applicant for a warrant to intercept communications. These Standards are intended to supplement the Prosecution Function Standards, not to supplant them. These Standards may not be applicable to a prosecutor serving in a minor supporting role to an investigation undertaken and directed by law enforcement agents.

## PART 1:
## GENERAL STANDARDS

## STANDARD 1.1 THE FUNCTION OF THESE STANDARDS

(a) These Standards address the investigative stage of the criminal justice process. They address the charge or post-charge stages of the criminal justice process only when those stages overlap with the investigative stage.

(b) Standards are not intended to serve as the basis for the imposition of professional discipline, nor to create substantive or procedural rights for accused or convicted persons. These Standards do not modify a prosecutor's ethical obligations under applicable rule of professional conduct. These Standards are not intended to create a standard of care for civil liability, nor to serve as a predicate for a motion to suppress evidence or dismiss a charge.

(c) The use of the term "prosecutor" in these Standards applies to any prosecutor or other attorney, regardless of agency or title, who serves as an attorney in a governmental criminal investigation.

## STANDARD 1.2 GENERAL PRINCIPLES

(a) An individual prosecutor is not an independent agent but is a member of an independent institution the primary duty of which is to seek justice.

(b) The prosecutor's client is the public, not particular government agencies or victims.

(c) The purposes of a criminal investigation are to:

(i) develop sufficient factual information to enable the prosecutor to make a fair and objective determination of whether and what charges should be brought and to guard against prosecution of the innocent, and

(ii) develop legally admissible evidence sufficient to obtain and sustain a conviction of those who are guilty and warrant prosecution.

(d) The prosecutor should:

(i) ensure that criminal investigations are not based upon premature beliefs or conclusions as to guilt or innocence but are guided by the facts;

(ii) ensure that criminal investigations are not based upon partisan or other improper political or personal considerations and do not invidiously discriminate against, nor wrongly favor, persons on the basis of race, ethnicity, religion, gender, sexual orientation, political beliefs, age, or social or economic status;

(iii) consider whether an investigation would be in the public interest and what the potential impacts of a criminal investigation might be on subjects, targets and witnesses; and

(iv) seek in most circumstances to maintain the secrecy and confidentiality of criminal investigations.

(e) Generally, the prosecutor engaged in an investigation should not be the sole decision-maker regarding the decision to prosecute matters arising out of that investigation.

(f) The prosecutor should be aware of and comply with the ethical rules and other legal standards applicable to the prosecutor's conduct during an investigation.

(g) The prosecutor should cooperate with other governmental authorities regarding matters that are of legitimate concern to such authorities when doing so is permitted by law and would not compromise an investigation or other criminal justice goals.

(h) The prosecutor's office should provide organizational structure to guide its members' investigative work.

## STANDARD 1.3 WORKING WITH POLICE AND OTHER LAW ENFORCEMENT AGENTS

(a) The prosecutor should respect the investigative role of police and other law enforcement agents by:

(i) working cooperatively with them to develop investigative policies; and

(ii) providing independent legal advice regarding their investigative decisions.

(b) The prosecutor should take steps to promote compliance by law enforcement agents with relevant legal rules.

(c) The prosecutor should be aware of the experience, skills and professional abilities of police and other law enforcement agents assigned to an investigation.

(d) The prosecutor's office should assist in providing training to police and other law enforcement agents concerning potential legal issues and best practices in criminal investigations.

(e) Before and throughout the course of complex or non-routine investigations, the prosecutor should work with the police and other participating agencies and experts to develop an investigative plan that analyzes:

(i) the investigative predicate or information concerning the matter that is then known;

(ii) the goals of the investigation;

(iii) the potential investigative techniques and the advantages of each, singularly and in combination, in producing relevant information and admissible evidence; and

(iv) the legal issues likely to arise during the investigation.

(f) The prosecutor should promote timely communications with police and other law enforcement agents about material developments in the investigation.

(g) The prosecutor should not seek to circumvent ethical rules by instructing or recommending that others use means that the prosecutor is ethically prohibited from using. The prosecutor may provide legal advice to law enforcement agents regarding the use of investigative techniques that law enforcement agents are authorized to use.

## STANDARD 1.4 VICTIMS, POTENTIAL WITNESSES, AND TARGETS DURING THE INVESTIGATIVE PROCESS

(a) Throughout the course of the investigation as new information emerges, the prosecutor should reevaluate:

(i) judgments or beliefs as to the culpability or status of persons or entities identified as "witnesses," "victims," "subjects" and "targets," and recognize that the status of such persons or entities may change; and

(ii) the veracity of witnesses and confidential informants and assess the accuracy and completeness of the information that each provides.

(b) Upon request and if known, the prosecutor should inform a person or the person's counsel, whether the person is considered

to be a target, subject, witness or victim, including whether their status has changed, unless doing so would compromise a continuing investigation.

(c) The prosecutor should know the law of the jurisdiction regarding the rights of victims and witnesses and should respect those rights.

(d) Absent a law or court order to the contrary, the prosecutor should not imply or state that it is unlawful for potential witnesses to disclose information related to or discovered during an investigation. The prosecutor may ask potential witnesses not to disclose information, and in doing so, the prosecutor may explain to them the adverse consequences that might result from disclosure (such as compromising the investigation or endangering others). The prosecutor also may alert an individual who has entered into a cooperation agreement that certain disclosures might result in violation of the agreement.

(e) The prosecutor should not imply the existence of legal authority to interview an individual or compel the attendance of a witness if the prosecutor does not have such authority.

(f) The prosecutor should comply with applicable rules and case law that may restrict communications with persons represented by counsel.

(g) The prosecutor should not take into consideration any of the following factors in making a determination of whether an organization has been cooperative in the context of a government investigation unless the specified conduct of the organization would constitute a violation of law or court order:

(i) that the organization has provided, or agreed to provide counsel to, or advanced, reimbursed or indemnified the legal fees and expenses of, an employee;

(ii) that the organization entered into or continues to operate under a joint defense or information sharing and common interest agreement with regard to the investigation;

(iii) that the organization shared its records or other historical information relating to the matter under investigation with an employee; or

(iv) that the organization did not sanction or discharge an employee who invoked his or her Fifth Amendment privilege against self-incrimination in response to government questioning of the employee.

(h) The prosecutor should not interfere with, threaten, or seek to punish persons or entities seeking counsel in connection with an investigation, nor should the prosecutor interfere with, threaten or seek to punish those who provide such counsel unless by doing so such conduct would constitute a violation of law or court order. A good faith basis for raising a conflict of interest, or for investigating

possible criminal conduct by the defense attorney, is not "interference" within the meaning of this Standard.

## STANDARD 1.5 CONTACTS WITH THE PUBLIC DURING THE INVESTIGATIVE PROCESS

(a) The prosecutor should neither confirm nor deny the existence of an investigation, or reveal the status of the investigation, nor release information concerning the investigation, with the following exceptions:

(i) releasing information reasonably necessary to obtain public assistance in solving a crime, apprehending a suspect, or calming public fears;

(ii) responding to a widely disseminated public call for an investigation by stating that the prosecutor will investigate, or decline to investigate the matter;

(iii) responding to a law enforcement or regulatory matter of significant public safety concern, by stating that the prosecutor will begin an investigation or begin a special initiative to address the issue, or by releasing information reasonably necessary to protect public safety, subject to restrictions in the law of the jurisdiction;

(iv) announcing future investigative plans in order to deter criminal activity;

(v) stating in an already publicized matter and where justice so requires, that the prosecutor will not initiate, will not continue, or has concluded an investigation of a person, entity, or matter and, if applicable, has informed the subject or potential subject of the decision not to file charges;

(vi) responding to widely disseminated false statements that the prosecutor is, or is not, investigating a person, entity, or matter;

(vii) stating whether and when, if court rules so permit, an event open to the public is scheduled to occur;

(viii) offering limited comment when public attention is generated by an event in the investigation (e.g., arrests, the execution of search warrants, the filing of charges, or convictions), subject to governing legal standards and court rules; and

(ix) making reasonable and fair responses to comments of defense counsel or others.

(b) Except as a proper part of a court proceeding and in accordance with applicable rules, the prosecutor should not publicly make the following types of statements or publicly disclose the following information about an investigation:

(i) statements of belief about the guilt or innocence, character or reputation of subjects or targets of the investigation;

(ii) statements that have a substantial likelihood of materially prejudicing a jury or jury panel;

(iii) information about the character or reputation of a person or entity under investigation, a prospective witness, or victim;

(iv) admissions, confessions, or the contents of a statement or alibi attributable to a person or entity under investigation;

(v) the performance or results of tests or the refusal or agreement of a suspect to take a test;

(vi) statements concerning the credibility or anticipated testimony of prospective witnesses; and

(vii) the possibility or likelihood of a plea of guilty or other disposition.

(c) The prosecutor should endeavor to dissuade police and other law enforcement agents and law enforcement personnel from making public information that the prosecutor would be prohibited from making public, or that may have an adverse impact on the investigation or any potential prosecution.

# PART 2:

## STANDARDS FOR SPECIFIC INVESTIGATIVE FUNCTIONS OF THE PROSECUTOR

### STANDARD 2.1 THE DECISION TO INITIATE OR TO CONTINUE AN INVESTIGATION

(a) The prosecutor should have wide discretion to select matters for investigation. Thus, unless required by statute or policy:

(i) the prosecutor should have no absolute duty to investigate any particular matter; and

(ii) a particularized suspicion or predicate is not required prior to initiating a criminal investigation.

(b) In deciding whether an investigation would be in the public interest, the prosecutor should consider, but not necessarily be dissuaded by, the following:

(i) a lack of police interest;

(ii) a lack of public or political support;

(iii) a lack of identifiable victims;

(iv) fear or reluctance by potential or actual witnesses; or

(v) unusually complex factual or legal issues.

(c) When deciding whether to initiate or continue an investigation, the prosecutor should consider:

(i) whether there is evidence of the existence of criminal conduct;

(ii) the nature and seriousness of the problem or alleged offense, including the risk or degree of harm from ongoing criminal conduct;

(iii) a history of prior violations of the same or similar laws and whether those violations have previously been addressed through law enforcement or other means;

(iv) the motive, interest, bias or other improper factors that may influence those seeking to initiate or cause the initiation of a criminal investigation;

(v) the need for, and expected impact of, criminal enforcement to:

(A) punish blameworthy behavior;

(B) provide specific andor general deterrence;

(C) provide protection to the community;

(D) reinforce norms embodied in the criminal law;

(E) prevent unauthorized private action to enforce the law;

(F) preserve the credibility of the criminal justice system; and

(G) other legitimate public interests.

(vi) whether the costs and benefits of the investigation and of particular investigative tools and techniques are justified in consideration of, among other things, the nature of the criminal activity as well as the impact of conducting the investigation on other enforcement priorities and resources

(vii) the collateral effects of the investigation on witnesses, subjects, targets and non-culpable third parties, including financial damage and harm to reputation

(viii) the probability of obtaining sufficient evidence for a successful prosecution of the matter in question, including, if there is a trial, the probability of obtaining a conviction and having the conviction upheld upon appellate review; and

(ix) whether society's interest in the matter might be better or equally vindicated by available civil, regulatory, administrative, or private remedies.

(d) When deciding whether to initiate or continue an investigation, the prosecutor should not be influenced by:

(i) partisan or other improper political or personal considerations, or by the race, ethnicity, religion, gender, sexual orientation, political beliefs or affiliations, age, or social or economic status of the potential subject or victim, unless they are elements of the crime or are relevant to the motive of the perpetrator; or

(ii) hostility or personal animus towards a potential subject, or any other improper motive of the prosecutor.

(e) The prosecutor's office should have an internal procedure to document the reason(s) for declining to pursue prosecution following a criminal investigation.


**STANDARD 2.2 SELECTING INVESTIGATIVE TECHNIQUES**

(a) The prosecutor should be familiar with routine investigative techniques and the best practices to be employed in using them.

(b) The prosecutor should consider the use of costlier, riskier, or more intrusive means of investigation only if routine investigative techniques would be inappropriate, ineffective, or dangerous, or if their use would impair the ability to take other desirable investigative steps. If non-routine techniques are used, the prosecutor should regularly reevaluate the need for them and whether the use of routine investigative techniques will suffice.

(c) The prosecutor should consider, in consultation with police and other law enforcement agents involved in the investigation, the following factors:

(i) the likely effectiveness of a particular technique;

(ii) whether the investigative means and resources to be utilized are appropriate to the seriousness of the offense;

(iii) the risk of physical danger to law enforcement officers and others;

(iv) the costs involved with various investigative techniques and the impact such costs may have on other efforts within the prosecutor's office;

(v) the possibility of lost opportunity if an investigative technique is detected and reveals the investigation;

(vi) means of avoiding unnecessary intrusions or invasions into personal privacy;

(vii) the potential entrapment of otherwise innocent persons;

(viii) the risk of property damage, financial loss to persons or businesses, damage to reputation or other harm to persons;

(ix) interference with privileged or confidential communication;

(x) interference with or intrusion upon constitutionally protected rights; and

(xi) the risk of civil liability or other loss to the government.

(d) The prosecutor should consider the views of experienced police and other law enforcement agents about safety and technical and strategic considerations in the use of investigative techniques.

(e) The prosecutor may consider that the use of certain investigative techniques could cause the subject of the investigation to retain legal counsel and thereby limit the use of some otherwise permissible investigative techniques.

(f) The prosecutor should avoid being the sole interviewer of a witness, being alone with a witness, or otherwise becoming an essential witness to any aspect of the investigation.

(g) While the prosecutor may, and sometimes should, seek changes in law and policy, the prosecutor should abide by existing legal restraints, even if the prosecutor believes that they unjustifiably inhibit the effective investigation of criminal conduct.

## STANDARD 2.3 USE OF UNDERCOVER LAW ENFORCEMENT AGENTS AND UNDERCOVER OPERATIONS

(a) For the purpose of these Standards, an "undercover law enforcement agent" is an employee of a government agency working under the direction and control of a government agency in a criminal investigation, whose true identity as a law enforcement agent involved in the investigation is concealed from third parties.

(b) For the purpose of these Standards, an "undercover operation" means an investigation in which undercover law enforcement agents or other persons working with law enforcement conceal their purpose of detecting crime or obtaining evidence to prosecute those engaged in illegal activities.

(c) In deciding whether to use or to advise the use of undercover law enforcement agents or undercover operations, the prosecutor should consider potential benefits, including:

(i) the character and quality of evidence likely to be obtained; and

(ii) the ability to prevent or solve crimes where obtaining reliable and admissible evidence to do so would otherwise be difficult or impossible to obtain.

(d) In deciding whether to use or to advise the use of undercover law enforcement agents or undercover operations, the prosecutor should consider potential risks, including:

(i) physical injury to law enforcement agents and others;

(ii) lost opportunity if the operation is revealed;

(iii) unnecessary intrusions or invasions into personal privacy;

(iv) entrapment of otherwise innocent persons;

(v) property damage, financial loss to persons or businesses, damage to reputation or other harm to persons;

(vi) interference with privileged or confidential communications;

(vii) interference with or intrusion upon constitutionally protected rights;

(viii) civil liability or other adverse impact on the government;

(ix) personal liability of the law enforcement agents;

(x) involvement in illegal conduct by undercover law enforcement agents or government participation in activity that would be considered unsuitable and highly offensive to public values and that may adversely impact a jury's view of a case; and

(xi) the possibility that the undercover operation will unintentionally cause an increase in criminal activity.

(e) The prosecutor advising an undercover investigation should:

(i) consult with appropriate police or law enforcement agents on a regular basis about the continued propriety of the operation and the legal sufficiency and quality of the evidence that is being produced by the operation;

(ii) seek periodic internal review of the investigation to determine whether the operation's benefits continue to outweigh its risks and costs, including the extent to which:

(A) the goals of the investigation have been accomplished;

(B) there is potential for the acquisition of additional useful and non- duplicative information;

(iii) the investigation can continue without exposing the undercover operation; and

(iv) continuation of the investigation may cause financial or other injury to innocent parties.

(f) The prosecutor should seek to avoid or minimize the risks involved in the active participation of undercover police or law enforcement agents in illegal activity, and provide such agents guidance about authorized participation in otherwise criminal conduct.

(g) Records of funds expended and generated by undercover activity should be retained and accounted for in a manner that facilitates a comprehensive and accurate audit.


STANDARD 2.4 USE OF CONFIDENTIAL INFORMANTS

(a) As used in these Standards, a "confidential informant" is a person who supplies information to police or law enforcement agents pursuant to an agreement that the police or investigative agency will seek not to disclose the person's identity. The identity of a confidential informant may also be unknown to the prosecutor. A confidential informant may in some instances become a cooperator, and in such circumstances reference should be made to Standard 2.5.

(b) The prosecutor should consider possible benefits from the use of a confidential informant, including whether the confidential informant might enable the government to obtain:

(i) first-hand, eyewitness accounts of criminal activity;

(ii) critical background information about the criminal activity or criminal organization under investigation;

(iii) information necessary to provide a basis for additional investigative techniques or court-ordered means of investigation such as a search warrant; and

(iv) identification of witnesses or leads to witnesses who can provide direction to further the investigation or valuable testimony to a grand jury or at trial.

(c) The prosecutor should consider possible risks from the use of a confidential informant. These include risks that the confidential informant will:

(i) be untruthful, or provide misleading or incomplete information;

(ii) compromise the criminal investigation by revealing information to others, including the subjects or targets of the investigation;

(iii) engage in behavior constituting entrapment;

(iv) commit or continue to commit crimes;

(v) be subject, or subject others, to serious risk of physical harm as a result of cooperating with law enforcement; and

(vi) interfere with privileged or confidential relationships or communications or violate the rights of the investigation's subject.

(d) The prosecutor should avoid being alone with a confidential informant, even for a brief period of time.

(e) Before deciding to rely upon the information provided by a confidential informant for significant investigative steps, the prosecutor should review the following with the police or law enforcement agents:

(i) the ability of the confidential informant to provide or obtain information relevant to the criminal investigation;

(ii) means of corroborating information received from the confidential informant;

(iii) the possible motives or biases of the confidential informant, including the motive to gain a competitive advantage over others in either criminal or legitimate enterprises;

(iv) the nature of any and all promises made to the prospective confidential informant by other prosecutors, police or law enforcement agents, including promises related to the treatment of associates or relatives of the confidential informant;

(v) the prior history of the confidential informant , including prior criminal activity and other information, including the informant's true identity if necessary for the prosecutor's review;

(vi) whether the prospective confidential informant is represented by an attorney or is party to a joint defense agreement with other targets of the investigation and, if so, how best to address potential legal or ethical issues related to the representation or agreement;

(vii) if reasonably available, the experience other prosecutors and law enforcement agents have had with the confidential informant;

(viii) whether the proposed compensation or benefits to be received by the confidential informant are reasonable under the circumstances;

(ix) the risk that the prospective confidential informant may be an agent of the subjects of the investigation or of other criminal groups and individuals, or may reveal investigative information to them; and

(x) the risk that the prospective confidential informant will engage in criminal activity not authorized by the prosecutor, and the seriousness of that unauthorized criminal activity.

(f) The prosecutor's office should work with police and law enforcement agents to develop best practices and policies for the use of confidential informants that include:

(i) a rule that investigative information obtained from other sources should not be provided to the confidential informant unless doing so would materially advance the investigation;

(ii) prohibitions on making promises of compensation or other benefits that would shock the conscience of a moral society or would risk compromising the credibility of the informant in any proceeding in which the informant's testimony may be important;

(iii) prohibitions on making promises that the police or law enforcement agents are unlikely to be able to keep;

(iv) routine instructions to confidential informants to refrain from criminal conduct other than as directed by law enforcement; and

(v) the routine use of standard form agreements when such agreements are entered into by law enforcement officers without the involvement of the prosecutor.


**STANDARD 2.5 COOPERATION AGREEMENTS AND COOPERATING INDIVIDUALS AND ORGANIZATIONAL WITNESSES**

(a) As used in these Standards, "cooperation agreements" are agreements between the prosecutor and otherwise culpable individuals or entities ("cooperators") who provide the government with assistance useful to an investigation in exchange for benefits.

A cooperator may have been a confidential informant earlier in the investigation.

(b) The prosecutor should ordinarily seek to have the cooperator plead guilty to an appropriate criminal charge rather than provide the cooperator immunity for culpable conduct.

(c) In deciding whether to offer a cooperator significant benefits, including a limit on criminal liability, immunity, or a recommendation for reduction of sentence, the prosecutor should consider whether:

(i) the cooperator is able and willing to provide valuable assistance to the investigation;

(ii) the cooperator will maintain the confidentiality or secrecy of the investigation;

(iii) the cooperator has biases or personal motives that might result in false, incomplete, or misleading information;

(iv) leniency or immunity for the criminal activity of the cooperator is warranted by the goals of the investigation and the public interest , including appropriate consideration for victim(s) interests;

(v) providing leniency, immunity or other benefits would be seen as offensive by the public or cause a reasonable juror to doubt the veracity of the cooperator's testimony;

(vi) information that has been provided (such as through an attorney proffer or by a debriefing of the cooperator) has been corroborated or can otherwise shown to be accurate;

(vii) the culpability of other participants in the criminal activity relative to the cooperator's culpability has been determined as accurately as possible;

(viii) there is a likelihood that the cooperator will provide useful information only if given leniency or immunity;

(ix) the case could be successfully prosecuted without the cooperator's assistance; and

(x) the cooperator could be successfully prosecuted without the admissions of the cooperator made pursuant to the agreement.

(d) The cooperation agreement should not:

(i) promise to forego prosecution for future criminal activity, except where such activity is necessary as part of an officially supervised investigative and enforcement program; or

(ii) adversely affect third parties' legal rights.

(e) The prosecutor should:

(i) be aware that anything said to the cooperator might be repeated to the cooperator's criminal associates or in open court; and

(ii) be aware of the disclosure requirements under relevant law if a cooperator ultimately testifies at trial, including disclosure of any and all agreements and promises made to the cooperator and evidence which could impact the cooperator's credibility, including the complete criminal history of the cooperator. The prosecutor should take steps to assure the preservation of such evidence.

(f) The prosecutor should recognize and respect the role of the cooperator's attorney in the decision to cooperate and in the disposition of significant legal rights.

(g) Ordinarily, a prosecutor who offers leniency in exchange for cooperation should not withdraw or threaten to withdraw the offer because of the potential cooperator's request to consult with counsel prior to deciding whether to accept it. However, if the time required for the potential cooperator to consult with counsel would render the agreement ineffective, the prosecutor may withdraw or threaten to withdraw the offer before there is opportunity for such consultation. In that event, the prosecutor may condition cooperation on an immediate and uncounseled decision to proceed.

(h) The prosecutor should reduce a cooperation agreement to writing as soon as practicable. An agreement should only cover those crimes known to the government at the time it is made, and should specify:

(i) the specific details of all benefits and obligations agreed upon;

(ii) the specific activities to be performed by the cooperator;

(iii) the requirement that the cooperator be truthful in dealing with the government and in all legal proceedings;

(iv) the prohibition against the cooperator's engaging in any criminal conduct other than as directed by law enforcement;

(v) the extent of the disposition of the potential criminal and civil claims against the cooperator;

(vi) a complete list of any other promises, financial benefits or understandings;

(vii) the limitations of the agreement with respect to the terms it contains and to the identified jurisdiction or jurisdictions; and

(viii) the remedy in the event the cooperator breaches the agreement.

(i) The prosecutor should avoid being alone with a cooperator even for a brief period of time.

(j) The prosecutor should guard against the cooperator obtaining information from others that invades the attorney-client or work product privileges or violates the Sixth Amendment right to counsel.

(k) Prior to relying on the cooperator's information in undertaking an investigative step that could cause adverse consequences to the investigation or to a third party, the prosecutor should be satisfied as to the truthfulness of the cooperator.

(l) If an investigative step involves an application to a court or other official body, the prosecutor should make appropriate and required disclosures about the cooperator to the court or other body.

(m) If the prosecutor suspects that the cooperator is not being truthful, the prosecutor should take reasonable steps to address such concerns and seek further corroboration of the cooperator's information.

(n) If the prosecutor determines that a cooperator has knowingly provided false information or otherwise breached the cooperation agreement, the prosecutor should:

(i) seek guidance from a supervisor;

(ii) undertake or request the initiation of an investigation into the circumstances;

(iii) consider the possible prosecution of the cooperator, and;

(iv) carefully reevaluate the investigation.

## STANDARD 2.6 THE DECISION TO ARREST DURING A CONTINUING CRIMINAL INVESTIGATION

(a) In making a tactical decision whether, when or where to arrest a subject during a continuing investigation, the prosecutor should consider the potential benefits of the arrest, including:

(i) protecting the public from a person known to present an imminent danger;

(ii) reducing the likelihood of flight;

(iii) preventing the destruction of evidence and providing an opportunity to obtain evidence of a crime pursuant to a search incident to arrest;

(iv) stopping or deterring the harassment or coercion of witnesses or other acts of obstruction of justice;

(v) creating an opportunity to ask questions about an unrelated crime;

(vi) encouraging other culpable individuals or witnesses to surrender to law enforcement and to cooperate with the investigation;

(vii) inducing relevant conversation or other communication likely to be intercepted by law enforcement; and

(viii) protecting the existence of an undercover agent or confidential informant, a cooperator or an undercover operation.

(b) In deciding whether, when or where to arrest a subject during a continuing investigation, the prosecutor should consider the potential risks of the arrest, including:

(i) limiting the continued conduct of a criminal investigation by alerting others involved in continuing criminal activity;

(ii) restricting the use of some investigative techniques;

(iii) triggering speedy charge and speedy trial rules;

(iv) triggering disclosure obligations that have been subject to delayed notice;

(v) appearing to be illegitimate or pre-textual and thus adversely affecting community support for police and prosecution efforts; and

(vi) causing significant shame, embarrassment or prejudice to the arrestee or innocent third parties and unintended and unfair financial impacts.

(c) The prosecutor should be aware that Sixth Amendment right to counsel issues raised by the filing of criminal charges may limit the availability of some investigative options, including:

(i) use of the grand jury as an investigative technique;

(ii) soliciting incriminating information from a charged individual; and

(iii) contacts with the individuals or entities who have been charged.


**STANDARD 2.7 USE OF SUBPOENAS**

(a) As used in these Standards, a "subpoena," however named or designated, is a written command for a person or entity to provide physical evidence, testimony or documents. A subpoena may be issued by a prosecutor, a court, a grand jury or a law enforcement agency, as provided by the law of the jurisdiction.

(b) In deciding whether to use a subpoena, the prosecutor should consider potential benefits including:

(i) the conservation of law enforcement resources by requiring others to search for and provide factual information and physical evidence needed for an investigation;

(ii) the imposition of an obligation on the subject of the subpoena to provide factual information or physical evidence;

(iii) the fact that no predicate or less of a showing is required to issue a subpoena, as compared to a search warrant;

(iv) the ability to delay or prevent a third party from voluntarily or compulsorily disclosing information about the

subpoena (including the disclosure of either the fact of the subpoena itself or of any information provided in response) as a means to preserve the secrecy of the investigation if authorized by law; and

(v) voluntary disclosures or cooperation by witnesses and subjects prompted by receipt of the subpoena.

(c) In deciding whether to use a subpoena, the prosecutor should consider the following potential risks and ways to mitigate them:

(i) that evidence will be destroyed or altered in between receipt and production;

(ii) that information responsive to the subpoena will be improperly withheld or that the request will be interpreted narrowly; and

(iii) that knowledge of the subpoena will cause the subjects of the investigation to disguise criminal activity, or take actions to impede or obstruct the investigation.

(d) The prosecutor using a subpoena should:

(i) seek to limit the scope of the subpoena to the needs of the investigation, avoid overbroad requests, and avoid seeking the production of attorney-client privileged material; and

(ii) provide reasonable accommodations based on factors such as the size or nature of the request, the impact of the request on legitimate business operations, or the time reasonably needed to perform a review for privileged or other legally protected fact information, unless doing so would be outweighed by the government's interest in avoiding delay.

(e) The prosecutor should ensure that materials received pursuant to a subpoena are properly stored, logged or indexed, and are readily retrievable.

(f) The prosecutor should accept copies of documents subject to a subpoena unless there is a specific need for original documents that outweighs the producing party's need and right to retain its original materials.

(g) The prosecutor should provide copies, or if necessary, reasonable access to copies or original documents to the person or entity who has produced the copies or originals.

(h) The prosecutor should seek to minimize the cost and dislocation suffered by a person or entity to whom a subpoena is issued and, where applicable, should inform the person or entity of any right to compensation allowed by law.

(i) The prosecutor should arrange for the return of subpoenaed documents and materials when the purpose for which they were subpoenaed has ended.

(j) The prosecutor involved in an investigation where police or law enforcement agents have legal authority to issue written requests for various records and data without probable cause or judicial oversight, should provide advice as to whether the proposed use of such authority is consistent with the limits of the applicable law, the Constitution, and the circumstances of the investigation.

**STANDARD 2.8 SEARCH WARRANTS**

(a) As used in these Standards a "search warrant" is a written command issued by a judge or magistrate that permits law enforcement agents to search specified persons or premises and seize specified effects and information.

(b) The prosecutor should consider the following potential benefits associated with using a search warrant:

(i) securing evidence that might otherwise be removed, hidden, altered or destroyed;

(ii) removing contraband from commerce before it is transferred or used;

(iii) seeing and documenting the precise location of the items to be seized in their natural or unaltered state or location;

(iv) obtaining statements by individuals at the scene of the search that might further the investigation;

(v) observing and recording the presence of individuals found together at the scene of the search as evidence of their coordination; and

(vi) encouraging other culpable individuals or witnesses to come forward and provide information to the investigation.

(c) The prosecutor should consider the following potential costs and risks before applying for a search warrant:

(i) the extensive utilization of limited government resources during the preparation and execution of a search warrant, as compared with other means of gathering information, such as a subpoena;

(ii) the intrusive nature of the execution of the warrant and its impact on personal privacy or on legitimate business operations;

(iii) the impact of execution of the warrant on innocent third parties who may be on the premises at the time the warrant is executed; and

(iv) the potential danger or harm to third parties.

(d) When the prosecutor is involved in an investigation, the prosecutor should review search warrant applications prior to their submission to a judicial officer. In all other cases, the prosecutor should encourage police and law enforcement agents to seek

prosecutorial review and approval of search warrants prior to their submission to a judicial officer.

(e) In jurisdictions that authorize telephonic warrants, the prosecutor should be familiar with the rules governing the use of such warrants and should be available to confer with law enforcement agents about them.

(f) In reviewing a search warrant application, the prosecutor should:

(i) seek to assure the affidavit is complete, accurate and legally sufficient;

(ii) seek to determine the veracity of the affiant and the accuracy of the information, especially when the application is based on information from a confidential informant; and

(iii) seek to ensure that the affidavit is not misleading and does not omit material information which has a significant bearing on probable cause.

(g) The prosecutor involved in the investigation should:

(i) generally, if time permits, meet in advance with all law enforcement and other personnel who will participate in the execution of the warrant to explain the scope of the warrant, including the area(s) to be searched and the items to be seized;

(ii) consistent with the goals of the investigation, provide legitimate business operations and third parties reasonable access to seized records;

(iii) avoid becoming a necessary percipient witness at the scene of the execution of the warrant but be readily available and accessible to respond to immediate questions or to assist in the preparation of additional warrant applications;

(iv) seek to ensure that an inventory is filed as required by relevant rules; and

(v) seek to preserve exculpatory evidence obtained during a search and consider the impact of such evidence on the criminal investigation.

(h) When searching an attorney's office, or any place where attorney-client or other privileged material is likely to be located or is discovered, the prosecutor should arrange for evidence to be recovered in such manner as to prevent or minimize any unauthorized intrusion into confidential relationships or information privileged under law.

(i) The prosecutor should seek to prevent or minimize the disclosure of information to the public which a person or entity may consider private or proprietary.

(j) The prosecutor should consider seeking to delay notice about the execution of a search warrant if such delay is authorized

by law and if prompt disclosure of the execution of the warrant could reasonably be expected to result in:

    (i) the endangerment of life or physical safety of an individual;

    (ii) the intimidation of potential witnesses;

    (iii) the flight from prosecution by a target of any investigation;

    (iv) the destruction of or tampering with evidence in any investigation; or

    (v) any other serious jeopardy to an investigation.

(k) The prosecutor should not notify media representatives of a search before it occurs and should advise law enforcement agents acting with the prosecutor in the investigation not to do so.

(l) The prosecutor should consider whether the papers supporting the search warrant should be sealed after the warrant is executed and should make application to do so only when the prosecutor believes that the public's interest in knowing of the warrant is outweighed by the need to maintain secrecy of the investigation or to prevent unfair publicity to the persons or organizations whose premises were searched.

## STANDARD 2.9 USE OF THE INVESTIGATIVE POWERS OF THE GRAND JURY

(a) In deciding whether to use a grand jury, the prosecutor should consider the potential benefits of the power of the grand jury to compel testimony or elicit other evidence by:

    (i) conferring immunity upon witnesses;

    (ii) obtaining evidence in a confidential forum;

    (iii) obtaining evidence from a witness who elects not to speak voluntarily to the police or prosecutor;

    (iv) obtaining documentary or testimonial evidence with the added reliability provided by the oath and the secrecy requirements of the grand jury;

    (v) obtaining documentary evidence from a third party that may be difficult to obtain from a target; and

    (vi) preserving witnesses' accounts in the form of sworn testimony where the jurisdiction provides for recording or transcription of the proceedings.

(b) In deciding whether to use a grand jury, the prosecutor should consider the potential risks including:

    (i) revealing the existence or direction of an investigation;

    (ii) obtaining evasive or untruthful testimony from witnesses who are loyal to targets or fearful of them;

(iii) relying on witnesses to obey the commands of subpoenas directing them to produce documents or physical evidence;

(iv) granting immunity to witnesses:

(A) who are not believed culpable at the time of the grant but are later found to be culpable; or

(B) who are later found to be more culpable than the prosecutor believed at the time of the grant;

(v) exposing grand jury witnesses to reputational, economic or physical reprisal; and

(vi) exposing grand jury witnesses to collateral consequences such as lost time from employment or family obligations, financial costs of compliance, and potential damage to their reputation from association with a criminal investigation.

(c) In pursuing an investigation through the grand jury, the prosecutor should:

(i) only bring a matter before the grand jury with the primary purpose of seeking justice and to be mindful of the ex parte nature of proceedings;

(ii) prepare adequately before conducting grand jury examinations;

(iii) know and follow the laws of the jurisdiction and the rules, practices, and policies of the prosecutor's office;

(iv) pose only legal and proper questions and, if within the knowledge of the prosecutor questioning may elicit a privileged or self-incriminating response, advise the witness of the existence of the applicable privilege; and

(v) unless prohibited by the law of the jurisdiction, ensure that grand jury proceedings are recorded.

(d) The prosecutor should use grand jury processes fairly and should:

(i) treat grand jurors with courtesy and give them the opportunity to have appropriate questions answered; however, the prosecutor should not allow questions that:

(A) elicit facts about the investigation that should not become known to the witness; or

(B) call for privileged, prejudicial, misleading or irrelevant evidence;

(ii) issue a subpoena ad testificandum only if the prosecutor intends to bring the witness before the grand jury;

(iii) refrain from issuing a subpoena that is excessively broad or immaterial to the legitimate scope of the grand jury's inquiry;

(iv) make reasonable efforts before a witness appears at the grand jury to determine that the testimony is needed, including

offering the witness or witness' counsel a voluntary pre-appearance conference;

(v) grant reasonable requests for extensions of dates for appearance and production of documents when doing so does not impede the grand jury's investigation; and

(vi) resist dilatory tactics by witnesses that undermine the grand jury's investigation, authority, or credibility.

(e) The prosecutor should examine witnesses with courtesy and in a manner designed to elicit truthful testimony, and should:

(i) consider warning a witness suspected of perjury of the obligations to tell the truth;

(ii) insist upon definite answers that will:

(A) fully inform the members of grand jury; and

(B) establish a clear record so that a witness committing perjury or contempt can be held responsible for such actions;

(iii) inform grand jury witnesses of their right to consult with their attorneys to the extent provided by the policy, procedure or law of the jurisdiction; and

(iv) seek a compulsion order only when the testimony sought is in the public interest, there is no other reasonable way to elicit such testimony, and the witness has refused to testify or has indicated an intent to invoke the privilege against self-incrimination.

(f) In determining whether obtaining testimony from a culpable witness will outweigh the cost of granting immunity, a prosecutor should consider the following factors:

(i) the relative culpability of the witness to be immunized as compared with the person against whom the testimony will be offered;

(ii) the gravity of the crime(s) being investigated;

(iii) the probability that the testimony would advance the investigation or an eventual prosecution;

(iv) the gravity of the crime(s) for which the witness would be granted immunity;

(v) the character and history of the witness being considered for immunity, including how these factors might affect the witness's credibility;

(vi) the scope of the immunity that the witness would receive;

(vii) the risk that the immunized witness would lie or feign lack of memory;

(viii) the risk that the immunized witness would falsely claim responsibility for criminal acts committed by another; and

(ix) the potential for the grand jury testimony to enhance truthful testimony by hostile or reluctant witnesses at trial or provide evidence to prove perjury if a witness lies at trial.

(g) Ordinarily, the prosecutor should not seek to compel testimony from a close relative of a target of an investigation by threatening prosecution or offering immunity, unless:

(i) the relative participated criminally in an offense or criminal enterprise with the target and the testimony sought would relate to that enterprise's activities;

(ii) the testimony sought relates to a crime involving overriding prosecutorial concerns; or

(iii) comparable testimony is not readily available from other sources.

(h) Ordinarily, the prosecutor should give notice to a target of a grand jury investigation and offer the opportunity for the target to testify without immunity before the grand jury. However, notice need not be provided if there is a reasonable possibility it will result in flight of the target, endanger other persons, or obstruct justice. Prior to taking a target's testimony, the prosecutor should advise the target of the privilege against self-incrimination and obtain a waiver of that right.

(i) A prosecutor with personal knowledge of non-frivolous evidence that directly negates the guilt of a subject of the investigation should present or otherwise disclose that evidence to the grand jury. If evidence is provided to the prosecutor by the subject or target of the investigation and the prosecutor decides not to provide the evidence to the grand jury, the prosecutor should notify the subject, target or their counsel of that decision without delay, so long as doing so would not jeopardize the investigation or prosecution or endanger others.

STANDARD 2.10 TECHNOLOGICALLY-ASSISTED PHYSICAL SURVEILLANCE

(a) As used in these Standards, "technologically-assisted physical surveillance" includes: video surveillance, tracking devices, illumination devices, telescopic devices, and detection devices.

(b) In deciding whether to use technologically-assisted physical surveillance, the prosecutor should consider the potential benefits, including:

(i) detecting the criminal possession of objects that are dangerous or difficult to locate; and

(ii) seeing or tracing criminal activity by means that are minimally intrusive and limiting the risks posed to the public and law enforcement personnel.

(c) In deciding whether to use technologically-assisted physical surveillance, the prosecutor should consider the legal and privacy implications for subjects, victims and third parties. The prosecutor should seek to use such surveillance techniques in proportion to the seriousness of the criminal activity being investigated and the needs of the particular investigation and in a manner designed to be minimally intrusive.

(d) In deciding whether to use technologically-assisted physical surveillance, the prosecutor should consider the legal requirements applicable to the technique under consideration, and whether those requirements have been met.

## STANDARD 2.11 CONSENSUAL INTERCEPTION, TRANSMISSION AND RECORDING OF COMMUNICATIONS

(a) As used in these Standards "consensual interception" is an electronic, digital, audio or video interception and recording of communications to which one or more but not all participants in the communications has consented.

(b) In deciding whether to use consensual interception, the prosecutor should consider the potential benefits, including obtaining direct, incriminating, and credible evidence that can be used alone or to corroborate other information.

(c) In deciding whether to use consensual interception, the prosecutor should consider the potential risks, including:

(i) problems of audibility and admissibility;

(ii) the danger of detection, including physical risk to those participating, and the risk of disclosure of the investigation;

(iii) selective recording of communications by the cooperating party;

(iv) the danger of obtaining false, misleading or self-serving statements by a party to the conversation who is aware or suspects that the conversation is being recorded;

(v) the risk that the consenting individual will conspire with the subject of the investigation to create false or misleading statements; and

(vi) the risk that the import of a conversation will be distorted by the cooperating party.

(d) To maximize the benefits and to minimize the risks of using consensual interception, the prosecutor should:

(i) obtain written or recorded consent from the consenting individual; and minimize to the extent practicable recording outside the presence of law enforcement agents and, if such a recording occurs or will occur:

(A) have law enforcement agents test and activate the recording equipment before the cooperating party meets with the subject; and

(B) minimize the necessity for the cooperating party to operate the recording equipment and, if it is necessary for the cooperating party to operate the equipment, provide that individual specific directions on how to operate the equipment and strict instruction to be present with it during such operation.

(e) The prosecutor, in consultation with the law enforcement agents, should regularly review all or selected recordings obtained during consensual interceptions.

(f) The prosecutor should take steps to ensure law enforcement agents comply with procedures relating to the acquisition of, custody of, and access to electronic equipment and recording media and to the secure preservation of any recordings produced whether they are obtained by consenting individuals or by law enforcement agents.

## STANDARD 2.12 NON-CONSENSUAL ELECTRONIC SURVEILLANCE

(a) As used in these Standards "non-consensual electronic surveillance" is the court-ordered interception of communications, actions, or events.

(b) In deciding whether to request a court order for non-consensual electronic surveillance, the prosecutor should consider the potential benefit of obtaining direct, incriminating, and credible evidence that can be used alone or to corroborate other information.

(c) In deciding whether to request a court order for non-consensual electronic surveillance, the prosecutor should consider the potential costs and risks, including:

(i) whether the suspected criminal activity being investigated is sufficiently serious and persistent to justify:

(A) the significant intrusion on the privacy interests of targets and innocent third parties;

(B) the need to obtain periodic reauthorization for electronic surveillance; and

(C) the financial and resource costs associated with such surveillance.

(ii) whether all requirements of the law are met.

(d) The prosecutor, including an applicant, should be aware of the reporting requirements under federal and state law and heightened obligations and accountability to the court in connection with the application and use of non-consensual electronic surveillance.

(e) Prior to the initiation of non-consensual electronic surveillance, the prosecutor should review the following with the law enforcement agents and contract personnel such as interpreters who will assist in the execution of the order:

(i) the scope of the order;

(ii) obligations of the monitoring law enforcement agents and monitoring personnel to minimize the interception of privileged conversations and other conversations outside the scope of the order and to alert the prosecutor promptly when recording evidence of new crimes;

(iii) the prohibition on listening without recording;

(iv) rules related to protecting the integrity and chain of custody of recordings;

(v) instructions to contact the prosecutor whenever a noteworthy event occurs, or there is a question regarding the execution of the order; and

(vi) the need to adhere to non-disclosure requirements.

(f) The prosecutor should stay informed of actions of law enforcement agents and contract personnel throughout the use of non-consensual electronic surveillance and should take appropriate steps to determine whether the required procedures are being followed by those carrying out the surveillance.

### STANDARD 2.13 CONDUCTING PARALLEL CIVIL AND CRIMINAL INVESTIGATIONS

(a) In deciding whether to conduct a criminal investigation and throughout any such investigation that is undertaken, the prosecutor should consider whether society's interest in the matter might be better or equally vindicated by available civil, regulatory, administrative, or private remedies.

(b) When doing so would not compromise a proper prosecutorial interest, and to the degree permitted by law, the prosecutor should cooperate with other governmental authorities regarding their investigations for the purpose of instituting remedial actions that are of legitimate concern to such entities. In the course of such cooperation, the prosecutor:

(i) should retain sole control of the criminal investigation and maintain independent judgment at all times;

(ii) should be aware of rules that prohibit or restrict the sharing or disclosure of information or material gathered through certain criminal investigative techniques;

(iii) should not be a party to nor allow the continuation of efforts by civil investigative agencies or attorneys to use the criminal process for the purpose of obtaining a civil settlement; and

(iv) may, in order to preserve the integrity of a criminal investigation or prosecution, ask a civil investigative agency to refrain from taking an investigative step or bringing an action but, in considering whether to do so, should consider the detriment to the public that may result from such forbearance.

(c) A prosecutor should consider the appropriateness of non-criminal or global (civil and criminal resolutions) dispositions suggested by subjects or targets, whether or not they choose to cooperate, and may consider proposals by them to include civil or regulatory sanctions as part of a disposition or cooperation agreement.

## STANDARD 2.14 TERMINATING THE INVESTIGATION, RETENTION OF EVIDENCE AND POST-INVESTIGATION ANALYSIS

(a) The prosecutor should diligently pursue the timely conclusion of criminal investigations.

(b) The prosecutor's office should periodically review matters under investigation in the office and determine whether the interests of justice would be served by terminating the investigation.

(c) The prosecutor should determine whether information obtained in investigations should be made available for civil enforcement purposes, administrative remedies, or for other purposes consistent with law and the public interest.

(d) To the extent feasible, the prosecutor and members of the investigative agencies should analyze investigations retrospectively, to evaluate techniques and steps that worked well or that proved to be deficient.

(e) Post-investigation analysis by the prosecutor's office should include seeking to identify ways other than prosecution to prevent, minimize or deter similar crimes from occurring in the future.

(f) Prosecutors should be aware of the requirements and office practices regarding the preservation of investigative records and of their compliance obligations with regard to information access and privacy law provisions.

(g) To the extent practicable, the prosecutor should, upon request, provide notice of termination of the investigation to subjects who became aware of the investigation.

(h) Upon termination of the investigation and related proceedings, physical evidence other than contraband should be returned promptly to the person from whom it was obtained, absent an agreement , court order or requirement of law to the contrary.

## STANDARD 2.15 GUIDANCE AND TRAINING FOR LINE PROSECUTORS

(a) A prosecutor's office should be organized in a manner to provide line prosecutors guidance consistent with these Standards.

(b) To guide the exercise of discretion, a prosecutor's office should:

(i) encourage consultation and collaboration among prosecutors;

(ii) appoint supervisors with appropriate experience, strong skills and a commitment to justice and ethical behavior;

(iii) require consultation and approval at appropriate supervisory levels for investigative methods of different levels of intrusiveness, risk and costs;

(iv) provide regular supervisory review throughout the course of investigations;

(v) regularly review investigative techniques and promote best practices to reflect changes in law and policy;

(vi) create and implement internal policies, procedures, and standard practices that teach and reinforce standards of excellence in performance, professionalism, and ethics;

(vii) create and implement policies and procedures that protect against practices that could result in unfair hardships, the pursuit of baseless investigations, and the bringing of charges against the innocent;

(viii) develop and support practices designed to prevent and to rectify conviction of the innocent.

(ix) determine what types of investigative steps require formal supervisory approval, and at what supervisory level, and

(x) require line attorneys to consult with supervisors or experienced colleagues when making significant investigative decisions absent exigent circumstances.

(c) A prosecutor's office should provide guidance and training by:

(i) strongly encouraging consultation and collaboration among line assistants;

(ii) appointing supervisors with appropriate experience and strong commitments to justice, and fostering close working relationships between supervisors and those they supervise;

(iii) providing formal training programs on investigative techniques and the ethical choices implicated in using them; and

(iv) creating internal policies and standard practices regarding investigations that memorialize and reinforce standards of excellence, professionalism, and ethics. In doing so:

(A) policy and practice materials should be regularly reviewed and updated and should allow flexibility for the exercise of prosecutorial discretion, and

(B) written policies and procedures should not be a substitute for regular training for all office members and a commitment to mentoring less-experienced attorneys.

(d) When a line prosecutor believes the needs of an investigation or some extraordinary circumstance require actions that are contrary to or outside of existing policies, the prosecutor should seek prior approval before taking such actions.

(e) A prosecutor's office should develop policies and procedures that address the initiation and implementation of the investigative tools discussed in these Standards in advance of the specific needs of an investigation.

## STANDARD 2.16 SPECIAL PROSECUTORS, INDEPENDENT COUNSEL AND SPECIAL PROSECUTION UNITS

(a) As used in these Standards, a "special prosecutor" or an "independent counsel" is a prosecutor serving independently from the general prosecution office under a particularized appointment and whose service in that role typically ends after the purpose of the appointment is completed. A "special prosecution unit" is typically a unit that focuses on a particular type of crime, criminal activity, or victim.

(b) Although the special prosecutor and the special prosecution unit are removed from the responsibilities of a general prosecution office, a prosecutor in this role should:

(i) be bound by the same policies and procedures as regular prosecutors in their jurisdiction, unless to do so would be incompatible with their duties;

(ii) base judgments about the merits of pursuing a particular investigation upon the same factors that should guide a regular prosecutor, including the seriousness of the offense, the harm to the public, and the expenditure of public resources; and

(iii) in choosing matters to investigate, consider the danger that the narrow focus or limited jurisdiction of the prosecutor or the unit will lead to the pursuit of what would, in a general prosecution office, be considered an insubstantial violation, or one more appropriately resolved by civil or administrative actions.

## STANDARD 2.17 USE OF INFORMATION, MONEY, OR RESOURCES PROVIDED BY NON-GOVERNMENTAL SOURCES

(a) The prosecutor may use information provided by non-governmental sources that is pertinent to a potential or existing criminal investigation. However, consistent with the principles in

Standard 2.1, the prosecutor should make an independent evaluation of the information and make an independent decision as to whether to allocate or continue to allocate resources to investigating the matter.

(b) If the law of the jurisdiction permits the acceptance of financial or resource assistance from non-governmental sources, the decision to accept such assistance should be made with caution by the chief public prosecutor or an accountable designee after careful consideration of:

(i) the extent to which the law of the jurisdiction permits the acceptance of financial or resource assistance;

(ii) the extent to which the offer is in the public interest, as opposed to an effort to achieve the limited private interests of the non-governmental sources;

(iii) the extent to which acceptance may result in foregoing other cases;

(iv) the potential adverse impact on the equal administration of the criminal law;

(v) the extent to which the character and magnitude of the assistance might unduly influence the prosecutor's subsequent exercise of investigative and prosecutorial discretion;

(vi) the likelihood that the community may view accepting the assistance as inconsistent with the fair and equal administration of criminal justice;

(vii) the likelihood that accepting assistance from private sources may create an appearance of undue influence over law enforcement; and

(viii) the extent to which financial or resource assistance would enhance or enable the investigation of criminal activity;

(c) The prosecutor should consider the risk that encouraging information gathering from non-governmental sources may lead to abusive, dangerous or even criminal actions by private parties.

(d) The office of the prosecutor should have procedures designed to protect the independent exercise of investigative discretion from being influenced by the receipt of outside financial or resource assistance, including careful accounting and recordkeeping of the amounts and terms of such assistance and clear disclosure that providing assistance will not guide the exercise of investigative or prosecutorial discretion.

(e) The prosecutor , consistent with the law of the jurisdiction, should disclose significant non-governmental assistance to relevant legislative or public bodies having oversight over the prosecutor's office and, when appropriate, the public.

(f) Non-governmental assistance should be disclosed to affected parties as part of the discovery process.

## STANDARD 2.18 USE OF SENSITIVE, CLASSIFIED OR OTHER INFORMATION IMPLICATING INVESTIGATIVE PRIVILEGES

(a) The prosecutor should be alert to the need to balance the government's legitimate interests in protecting certain information from disclosure, and the legitimate interests and Constitutional rights of the public and of defendants favoring disclosure.

(b) When appropriate, the prosecutor should request court orders designed to protect the disclosure of law enforcement means and methods, informant identities, observation posts, and such other information that might jeopardize future investigations or the safety or reputation of persons directly or indirectly involved in an investigation.

(c) In investigations believed to have the potential to include classified or sensitive information, prosecutors should seek to obtain the relevant information and consult laws, regulations and other requirements for handling such information before making any charging decisions.

## PART 3:

## PROSECUTOR'S ROLE IN RESOLVING INVESTIGATION PROBLEMS

## STANDARD 3.1 PROSECUTOR'S ROLE IN ADDRESSING SUSPECTED LAW ENFORCEMENT MISCONDUCT

(a) If the prosecutor has reason to suspect misconduct or unauthorized illegal activity at any level of the prosecutor's office or in any agency or department engaged in a criminal investigation, the prosecutor should promptly report the suspicion and the reason for it to appropriate supervisory personnel in the prosecutor's office who have authority to address the problem, or to the appropriate inspector general's office, or similar agency, if reporting within the prosecutor's own office is problematic. Reporting may also be required to comply with requirements of the applicable rules of professional conduct, the Model Rules and the law of the jurisdiction.

(b) If the prosecutor has reason to believe that a criminal investigation or prosecution is, or is likely to be, adversely affected by incompetence, lack of skilled personnel or inadequate resources in the prosecutor's office or in any other relevant agency or department, the prosecutor should promptly report that belief and the reason for it to supervisory personnel in the prosecutor's office.

(c) A supervisory prosecutor who receives an allegation of misconduct, unauthorized illegal conduct, or who receives an allegation of incompetence, inadequate resources, or lack of skilled

personnel that is, or is likely to, adversely affect a criminal investigation, should undertake a prompt and objective review of the facts and circumstances or refer the matter to an appropriate agency or component responsible for addressing such allegations. When practicable, the line prosecutor making any such allegations should not be involved in subsequent investigation(s) relating to the allegation(s).

(d) If the prosecutor's office concludes that there is a reasonable belief that personnel in any agency or department have engaged in unauthorized illegal conduct, the prosecutor's office should initiate a criminal investigation into the conduct or seek the initiation of such an investigation by an appropriate outside agency or office.

(e) If the prosecutor's office concludes that there was not unauthorized illegal conduct, but concludes that there was incompetence or non-criminal misconduct, the prosecutor's office should take appropriate action to notify the relevant agency or department, and if within the prosecutor's own office, to impose sanctions for the conduct.

(f) Decisions on how to respond to allegations of unauthorized illegal conduct, misconduct, or significant incompetence should generally be made without regard to adverse consequences on pending cases or investigations.

**STANDARD 3.2 PROSECUTOR'S ROLE IN ADDRESSSING SUSPECTED JUDICIAL MISCONDUCT**

(a) Although judges are not exempt from criminal investigation, the prosecutor's office should protect against the use of false allegations as a means of harassment or abuse that may impact the independence of the judiciary.

(b) If a line prosecutor has reason to believe that there is significant misconduct or illegal activity by a member of the judiciary, the line prosecutor should promptly report that belief and the reasons for it to supervisory personnel in the prosecutor's office.

(c) Upon receiving from a line prosecutor, or from any source, an allegation of significant misconduct or illegal conduct by a member of the judiciary, a supervisory prosecutor should undertake a prompt and objective review of the facts and circumstances.

(d) If the prosecutor's office has a reasonable belief that a member of the judiciary has engaged in criminal conduct, the prosecutor's office should initiate, or seek the initiation of, a criminal investigation.

(e) If the prosecutor's office concludes that a member of the judiciary has not engaged in illegal conduct, but has engaged in

non-criminal misconduct, the prosecutor's office should take appropriate action to inform the relevant officer of the judicial authorities. Reporting may also be required to comply with requirements of the applicable rules of professional conduct, the Model Rules and the law of the jurisdiction.

(f) The prosecutor's office should take reasonable steps to assure the independence of any investigation of a judge before whom the prosecutor's office practices. In some instances, this may require the appointment of a "pro tem" or "special" prosecutor or use of a "fire-wall" within the prosecutor's office.


## STANDARD 3.3 PROSECUTOR'S ROLE IN ADDRESSING SUSPECTED MISCONDUCT BY DEFENSE COUNSEL

(a) Although defense counsel are not exempt from criminal investigation, the prosecutor's office should protect against the use of false allegations as a means of harassment or abuse that may impact the independence of the defense counsel or the Constitutionally protected right to counsel.

(b) If a line prosecutor has reason to believe that defense counsel is engaging in criminal conduct, is violating the duty to protect a client, or is engaging in unethical behavior or misconduct, the prosecutor should promptly report that belief and the reasons for it to supervisory personnel in the prosecutor's office.

(c) Upon receiving from a line prosecutor, or from any source, an allegation of misconduct or illegal conduct by defense counsel, a supervisory prosecutor should undertake a prompt and objective review of the facts and circumstances.

(d) If the prosecutor's office has a reasonable belief that defense counsel has engaged in illegal conduct, the prosecutor's office should initiate, or seek the initiation of, an investigation into the conduct.

(e) If the prosecutor's office concludes that defense counsel has not engaged in illegal conduct, but has engaged in non-criminal misconduct as defined by the governing ethical code and the rules of the jurisdiction, the prosecutor's office should take appropriate action to inform the appropriate disciplinary authority.

(f) The prosecutor's office should take reasonable steps to assure the independence of any investigation of a defense counsel including, if appropriate, the appointment of a pro tem or special prosecutor or use of a "fire-wall" within the prosecutor's office. At a minimum, an investigation of defense counsel's conduct should be conducted by a prosecutor who has not been involved in the initial matter or in ongoing matters with that defense counsel.

(g) The prosecutor investigating defense counsel should consider whether information regarding conduct by defense counsel should be provided to a judicial officer involved in

(a) The prosecutor should resist political pressure intended to influence the conduct, focus, duration or outcome of a criminal investigation.

(b) The prosecutor should generally not make decisions related to a criminal investigation based upon their impact on the political process.

(c) When, due to the nature of the investigation or the identity of investigative targets, any decision will have some impact on the political process (such as an impending election), the prosecutor should make decisions and use discretion in a principled manner and in a manner designed to limit the political impact without regard to the prosecutor's personal political beliefs or affiliations.

(d) The prosecutor should carefully consider the language in Standard 1.5 ("Contacts with the Public During the Investigative Process") when making any statements or reports regarding a decision to prosecute, or to decline to prosecute, in a matter that may have some impact on the political process.


## STANDARD 3.7 REVIEW AND OVERSIGHT OF CRIMINAL INVESTIGATIONS BY GOVERNMENT AGENCIES AND OFFICIALS

(a) Prosecutors' offices should attempt to respond in a timely, open, and candid manner to requests from public officials for general information about the enforcement of laws under their jurisdiction or about law reform matters. However, if public officials seek information about ongoing or impending investigations, the prosecutors' offices should consider the potential negative impact of providing such information and should inform public officials about such concerns.

(b) Generally, responses to public officials should be made by high-ranking officials in the prosecutor's office who have policy-making authority. Prosecutors' offices should resist allowing line-attorneys to respond to requests for information by public officials.

(c) Generally, responses to information requests by public officials should be through testimony or by providing pertinent statistics and descriptive and analytical reports, and not by providing information about particular matters. Prosecutors' offices should resist requests for materials that are subject to deliberative process or work product privileges related to pending criminal investigations or closed investigations whose materials have not otherwise been made public, and should oppose disclosure of information that would adversely affect a person or entity.

(d) Prosecutor's offices may respond to requests about the handling of fully adjudicated cases. Absent unusual circumstances, information about adjudicated cases should be provided by high-

ranking officials with policy-making authority, and not by line attorneys.

(e) The Prosecutor's office should establish clear and consistent policies to address its responsibilities under public disclosure laws and with regard to the public's potential access to closed matters. The Prosecutor's office should provide sufficient resources to make prompt and appropriate replies to any public disclosure requests.

Back to Top

Copyright American Bar Association. http://www.abanet.org



overseeing aspects of the investigation in which the misconduct occurred.

(h) The prosecutor investigating defense counsel who is representing a client in a criminal matter under the jurisdiction of the prosecutor's office ordinarily should notify the attorney and the court in a timely manner about the possibility that potential charges against the attorney may create a conflict of interest.

## STANDARD 3.4 PROSECUTOR'S ROLE IN ADDRESSING SUSPECTED MISCONDUCT BY WITNESSES, INFORMANTS OR JURORS

(a) If a line prosecutor has reason to believe that there has been illegal conduct or non-criminal misconduct by witnesses, informants, or jurors, the prosecutor should seek supervisory review of the matter.

(b) Upon receiving an allegation of unauthorized illegal conduct or non-criminal misconduct by witnesses, informants or jurors, the prosecutor's office should undertake a prompt and objective review. If there is a reasonable belief that there has been illegal conduct or non-criminal misconduct, the prosecutor's office should initiate an investigation into the conduct. All relevant evidence should be preserved in the event it must be disclosed if criminal charges are filed against the individual alleged to have engaged in the conduct.

(c) If the misconduct relates to the official duties of a juror or witness, it must also be reported to an appropriate judicial officer.

## STANDARD 3.5 ILLEGALLY OBTAINED EVIDENCE

(a) If a prosecutor reasonably believes that evidence has been illegally obtained, the prosecutor should consider whether there are potential criminal acts that should be investigated or misconduct that should be addressed or reported. The prosecutor should be familiar with the laws of their jurisdiction regarding the admissibility of illegally obtained evidence.

(b) The prosecutor should take appropriate steps to limit the taint, if any, from the illegally obtained evidence and determine if the evidence may still be lawfully used.

(c) The prosecutor should notify the parties affected by the illegal conduct at the earliest time that will not compromise the investigation or subsequent investigation, or at an earlier time if required by law.

STANDARD 3.6 RESPONDING TO POLITICAL PRESSURE AND CONSIDERATION OF THE IMPACT OF CRIMINAL INVESTIGATIONS ON THE POLITICAL PROCESS